~~THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AND NO ONE MAY SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION/LIQUIDATION UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION. THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER MODIFICATION PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.~~ **IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| Rooftop Group International Pte. Ltd., *et al.*[1] | | |
| § | Case No. 19-43402-mxm | |
| | § | |
| | § | |
| | § | |
| Debtors. | § | Jointly Administered |

**DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION / LIQUIDATION OF ROOFTOP GROUP INTERNATIONAL PTE. LTD., ROOFTOP GROUP USA, INC. AND ROOFTOP GROUP SERVICES (US) INC. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ROOFTOP GROUP INTERNATIONAL PTE. LTD. AND THE CHAPTER 11 TRUSTEE OF ROOFTOP GROUP USA, INC. AND ROOFTOP GROUP SERVICES (US) INC.**

Judith W. Ross
State Bar No. 21010670
Rachael L. Smiley
State Bar No. 24066158
ROSS & SMITH, PC
700 North Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: judith.ross@judithwross.com
rachael.smiley@judithwross.com

James E. Van Horn
(admitted *pro hac vice*)
BARNES & THORNBURG LLP
1717 Pennsylvania Avenue NW, Suite 500
Washington, D.C. 20006-4623
Telephone: 202-371-6351
Facsimile: 202-289-1330
Email: jvanhorn@btlaw.com

**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ROOFTOP GROUP INTERNATIONAL PTE. LTD., Case No. 19-43402-mxm11**

---

[1] The Debtors in these chapter 11 cases are, including the last four digits of their respective EIN numbers, as follows: Rooftop Group International Pte. Ltd. (no EID), Rooftop Group USA, Inc. (8810) and Rooftop Group Services (US), Inc. (3705). The mailing address for Rooftop International is 5218 Spruce Street, Bellaire, TX 77401, and the mailing address for the chapter 11 Trustee of Rooftop USA and Rooftop Services is 509 North Montclair Avenue, Dallas, Texas 75208-5498.

Daniel J. Sherman
State Bar No. 18241000
SHERMAN & YAQUINTO, L.L.P.
509 N. Montclair Avenue
Dallas, TX 75208-5498
Telephone: 214-942-5502
Facsimile: 214-946-7601
Email: Corky@syllp.com

**CHAPTER 11 TRUSTEE, ROOFTOP GROUP USA, INC., Case No. 19-44234-mxm11, and ROOFTOP GROUP SERVICES (US) INC., Case No. 19-44235-mxm11**

Dated: June 3, 2020

**TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | DEFINITIONS | 3 |
| III. | EVENTS LEADING TO BANKRUPTCY FILINGS | 3 |
| IV. | THE BANKRUPTCY CASES AND RELATED PROCEEDINGS | ~~7~~8 |
| | A. Appointment of Creditors' Committee and Committee Professionals | ~~7~~8 |
| | B. Debtor's Engagement of Professionals | ~~8~~9 |
| | C. Rooftop International's Proposed Sale of Assets | 9 |
| | D. Plan Exclusivity Period | ~~9~~10 |
| | E. Committee's Rule 2004 Motion | 10 |
| | F. Original Plan | 10 |
| | G. Other Chapter 11 Matters | 11 |
| | H. Rooftop USA Sale | 11 |
| | I. Trustee's Engagement of Professionals | ~~11~~12 |
| | J. Chapter 11 Conversion and Appointment of Chapter 11 Trustee | 12 |
| | K. Joint Administration | 12 |
| V. | ASSETS, OPERATIONS AND LIABILITIES OF THE DEBTORS | ~~12~~13 |
| | A. Assets | ~~12~~13 |
| | B. Operating Performance | 13 |
| | C. Liabilities of the Debtors | 13 |
| | 1. Administrative Claims Other Than Fee Claims | ~~13~~14 |
| | 2. Fee Claims | ~~13~~14 |
| | 3. Priority Claims | ~~13~~14 |
| | 4. Secured Claims | ~~13~~14 |
| | 5. General Unsecured Claims | ~~13~~14 |
| VI. | SUMMARY OF THE PLAN | 14 |
| | A. Plan Concept | 14 |
| | B. Payments to Creditors | 15 |
| | 1. Secured Creditors | 15 |
| | 2. Unsecured Creditors | ~~15~~16 |
| | 3. Timing and Amount of Payments | ~~15~~16 |
| | C. The Status of the Debtors' Officers after Confirmation | ~~15~~16 |
| | D. Plan Provisions Governing Classification and Treatment of Claims | 16 |
| | 1. Unclassified Claims | 16 |
| | 2. Classification of Claims and Interests | ~~16~~17 |
| | E. Treatment of Claims | 17 |
| | 1. Claims and Interests | 17 |
| | 2. Class 1 Claims - Priority Claims | 17 |
| | 3. Class 2 Claim - Secured Claims | 17 |
| | 4. Class 3 Claims – General Unsecured Claims | ~~17~~18 |

|  |  |  |  |
|---|---|---|---|
|  | 5. | Class 4 - Interests | ~~17~~18 |
| F. | | Means for Plan Implementation; General | ~~17~~18 |
|  | 1. | Restructuring or Liquidation | ~~17~~18 |
|  | 2. | Corporate Action | 18 |
|  | 3. | Substantive Consolidation | 18 |
|  | 4. | Causes of Actions | ~~18~~19 |
|  | 5. | Litigation Trust | ~~19~~20 |
|  | 6. | Post-Effective Date Professional Fees and Expenses | 20 |
|  | 7. | Dissolution of Committee | 20 |
|  | 8. | Discharge of Trustee | ~~20~~21 |
| G. | | Means for Plan Implementation; Restructuring | ~~20~~21 |
|  | 1. | The New Board | ~~20~~21 |
|  | 2. | Restructuring Transactions | ~~20~~21 |
|  | 3. | New Secured Financing | 21 |
|  | 4. | New Common Stock | 22 |
|  | 5. | Stockholders Agreement | 22 |
|  | 6. | Management Incentive Plan | 22 |
|  | 7. | Senior Management | ~~22~~23 |
|  | 8. | Continued Corporate Existence | ~~22~~23 |
|  | 9. | Vesting of Assets in the Post-Confirmation Debtor | ~~22~~23 |
|  | 10. | Cancellation of Security Interests and Other Interests | 23 |
|  | 11. | Exemption from Registration Requirements; Trading of Securities | 23 |
|  | 12. | Organizational Documents | ~~23~~24 |
|  | 13. | Exemption from Certain Transfer Taxes and Recording Fees | ~~23~~24 |
|  | 14. | Discharge of Claims | 24 |
| H. | | Means for Plan Implementation; Liquidation | ~~24~~25 |
|  | 1. | Corporate Action | ~~24~~25 |
|  | 2. | Plan Administrator | ~~24~~25 |
|  | 3. | Resignation, Death, or Removal | ~~25~~26 |
|  | 4. | Winding Up Affairs | 26 |
|  | 5. | Release of Liens | ~~26~~27 |
|  | 6. | Formation and Powers of the Oversight Committee | ~~26~~27 |
|  | 7. | Dissolution | ~~27~~28 |
|  | 8. | Insurance | ~~27~~28 |
| I. | | Distributions | 28 |
|  | 1. | Disbursing Agent | 28 |
|  | 2. | Expenses of the Disbursing Agent | 28 |
|  | 3. | Rights and Powers of Disbursing Agent | 28 |
|  | 4. | Delivery of Distributions | ~~28~~29 |
|  | 5. | Record Date for Distributions | ~~28~~29 |
|  | 6. | Reserve for Plan Expenses | ~~28~~29 |
|  | 7. | Objections to Claims | 29 |
|  | 8. | Distributions on Disputed Claims | 29 |
|  | 9. | Disputed Claim Reserves | ~~29~~30 |
|  | 10. | Unclaimed Property | ~~29~~30 |
|  | 11. | Withholding Taxes | 30 |

|  |  | 12. | Fractional Cents | 30 |
|  |  | 13. | Payments of Less than Twenty-Five Dollars | ~~30~~31 |
|  |  | 14. | Means of Cash Payment | ~~30~~31 |
|  |  | 15. | Setoffs | ~~30~~31 |
|  | J. | | Unexpired Leases and Executory Contracts | ~~30~~31 |
|  |  | 1. | General Treatment of Executory Contracts and Unexpired Leases | 31 |
|  |  | 2. | Rejection Damages Claims | 31 |
|  | K. | | Conditions Precedent to the Effectiveness of the Plan. | 31 |
|  |  | 1. | Financing Condition | 31 |
|  |  | 2. | Conditions to Consummating a Liquidation | ~~31~~32 |
|  |  | 3. | Additional Condition to Consummating a Restructuring | ~~31~~32 |
|  |  | 4. | Waiver of Conditions | 32 |
|  |  | 5. | Effect of Failure of Condition | 32 |
|  | L. | | Cramdown | 32 |
|  | M. | | Effect of Confirmation | ~~32~~33 |
|  |  | 1. | *Exculpation* | ~~32~~33 |
|  |  | 2. | *Voluntary Releases by the Releasing Parties* | ~~32~~33 |
|  |  | 3. | *Injunction* | ~~33~~34 |
|  | N. | | Retention of Jurisdiction | 34 |
|  |  | 1. | Claims | 34 |
|  |  | 2. | Injunctions | 34 |
|  |  | 3. | Fee Claims | ~~34~~35 |
|  |  | 4. | Dispute Resolution | ~~34~~35 |
|  |  | 5. | Leases and Executory Contracts | ~~34~~35 |
|  |  | 6. | Actions | ~~34~~35 |
|  |  | 7. | Causes of Action | ~~34~~35 |
|  |  | 8. | Taxes | ~~34~~35 |
|  |  | 9. | General Matters | 35 |
|  |  | 10. | Plan Modification | 35 |
|  |  | 11. | Aid Consummation | 35 |
|  |  | 12. | Implementation of Confirmation Order | 35 |
|  |  | 13. | Final Decree | 35 |
| VII. | | | LIQUIDATION AS AN ALTERNATIVE TO THE PLAN | ~~35~~36 |
| VIII. | | | PERFORMANCE OF THE PLAN AND RISK FACTORS | 36 |
|  | A. | | The Committee and Trustee May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan | ~~36~~37 |
|  | B. | | The Committee and Trustee May Not Be Able to Secure Confirmation of the Plan | ~~36~~37 |
|  | C. | | Risk of Non-Occurrence of Effective Date | 37 |
|  | D. | | Approval of the Plan By the Singapore Court May Be Required | ~~37~~38 |
|  | E. | | Post-Effective Date Risks | ~~37~~38 |
| IX. | | | TAX CONSEQUENCES OF PLAN | ~~37~~38 |
|  | A. | | Introduction | ~~37~~38 |
|  | B. | | Tax Consequences to the Debtors | 38 |

C.    Tax Consequences to Creditors. .................................................. 3839
     1.    In General ....................................................................... 3839
     2.    Gain or Loss on Exchange ........................................... 3839
D.    Information Reporting and Backup Withholding .............. 39

X.    CONFIRMATION OF THE PLAN ......................................................... 39

A.    No Unfair Discrimination/Fair and Equitable Test .......... 3940
B.    "Best Interests" Test ......................................................... 40
C.    Feasibility .......................................................................... 4041

XI.   MISCELLANEOUS PROVISIONS ........................................................ 4041

A.    Modification ....................................................................... 4041
B.    Withdrawal ......................................................................... 41
C.    Binding Effect .................................................................... 41
D.    Successors and Assigns ...................................................... 41
E.    Governing Law ................................................................... 41
F.    United States Trustee Fees ................................................. 4142
G.    Non-Voting Equity Securities ........................................... 4142
H.    Retiree Benefits ................................................................. 4142
I.    Section 1146 Exemption .................................................... 4142
J.    Severability ........................................................................ 42
K.    Waiver of Stay .................................................................... 42
L.    No Release by United States Government, Agencies, State or Local
      Authorities .......................................................................... 43

XII.  CONCLUSION AND RECOMMENDATION ......................................... 4243

## I.     INTRODUCTION

Rooftop Group International Pte. Ltd. ("Rooftop International"), a private limited company formed under the laws of Singapore, filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas on April 30, 2019. As of the Petition Date, ownership of Rooftop International was held by three entities: (i) Gandiva Investments Limited, holder of 69% of the equity; (ii) Asset Resolution Company SPC, holder of 30% of the equity; and (iii) Triumphant Gold Limited, holder of 1% of the equity. The Chapter 11 Case commenced thereby was originally pending before the Honorable Harlin D. Hale in the Dallas Division of the Northern District of Texas under Case No. 19-31443-hdh11. On August 20, 2019, the Bankruptcy Court entered an Order transferring and reassigning the Chapter 11 Case to the Honorable Mark X. Mullin in the Fort Worth Division of the Northern District of Texas under Case No. 19-43402-mxm11. From and after the Petition Date, Rooftop International has continued to operate its business as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

Rooftop Group USA, Inc. ("Rooftop USA"), a California corporation 100% owned by Darren Matloff, filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas on August 25, 2019. The Rooftop USA Chapter 7 Case commenced was originally pending before the Honorable Harlin D. Hale in the Dallas Division of the Northern District of Texas under Case No. 19-38204-hdh7. On October 11, 2019, the Bankruptcy Court entered an Order transferring and reassigning the Chapter 7 Case to the Honorable Mark X. Mullin in the Fort Worth Division of the Northern District of Texas under Case No. 19-44234-mxm7. On May 7, 2020, the Bankruptcy Court entered an Order converting the Chapter 7 Case to a Case under Chapter 11 and directing the Office of the United States Trustee to appoint a Chapter 11 Trustee. On May 12, 2020, the Office of the United States Trustee appointed Daniel J. Sherman as the Chapter 11 Trustee.

Rooftop Group Services (US) Inc. ("Rooftop Services"), a New Hampshire corporation 100% owned by Rooftop International, filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas on August 25, 2019. The Rooftop Services Chapter 7 Case commenced was originally pending before the Honorable Stacey G. Jernigan in the Dallas Division of the Northern District of Texas under Case No. 19-32805-sgj7. On October 11, 2019, the Bankruptcy Court entered an Order transferring and reassigning the Chapter 7 Case to the Honorable Mark X. Mullin in the Fort Worth Division of the Northern District of Texas under Case No. 19-44235-mxm7. On May 7, 2020, the Bankruptcy Court entered an Order converting the Chapter 7 Case to a Case under Chapter 11 and directing the Office of the United States Trustee to appoint a Chapter 11 Trustee. On May 12, 2020, the Office of the United States Trustee appointed Daniel J. Sherman as the Chapter 11 Trustee.

Rooftop International, Rooftop USA and Rooftop Services are collectively referred to as the "Debtors."

This Disclosure Statement is provided pursuant to Section 1125 of the Bankruptcy Code to all of the Debtors' known creditors, Interest holders and other parties in interest in connection with the solicitation of acceptances of the Plan of Reorganization/Liquidation of Rooftop Group

International Pte. Ltd., Rooftop Group USA, Inc. and Rooftop Group Services (US) Inc. pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Official Committee of Unsecured Creditors of Rooftop International and the Chapter 11 Trustee for Rooftop USA and Rooftop Services which has been filed with the Bankruptcy Court.

On February 16, 2020, the Committee[2] filed its *First Amended Plan of Reorganization/Liquidation of Rooftop International Pte. Ltd. Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Official Committee of Unsecured Creditors* [Docket No. 177 in the Rooftop International case] (the "Original Plan"), as well as its *Disclosure Statement* in support of the Original Plan [Docket No. 178 in the Rooftop International case]. On February 25, 2020, the Court entered its *Order (i) Approving Disclosure Statement, (II) Approving the Procedures to Solicit Acceptances of the Plan of Reorganization/Liquidation, and (III) Scheduling a Hearing and Establishing Notices and Objection Procedures for Confirmation of the Plan of Reorganization/Liquidation* [Docket No. 181 in the Rooftop International case].

The Committee solicited its Original Plan, and all creditors in both impaired classes eligible to vote submitting ballots (collectively holding greater than $35 million in claims) unanimously voted in favor of the Original Plan [*see* Ballot Certification at Docket No. 198 in the Rooftop International case]. The deadline for voting and objecting to the Original Plan was April 13, 2020, and no parties objected or otherwise responded to the Original Plan. The confirmation hearing for the Committee's Original Plan was originally scheduled for April 20, 2020 at 1:30 pm, CT in the Rooftop International case, however, on account of the outbreak of novel coronavirus, which causes the disease designated as COVID-19 (*see* General Order 2020-05, *Court Operations Under Exigent Circumstances Created by the COVID-19 Pandemic),* the confirmation hearing was continued to June 16, 2020 at 1:30 pm, CT. The Committee and Trustee anticipate that the confirmation hearing on the Plan shall be scheduled at a later date after June 16, 2020.

The Plan contemplates substantive consolidation of the Debtors for the purposes of voting, allowance of claims, and distributions to holders of Allowed Claims. The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable investor typical of the holders of Claims or Interests to make an informed judgment in exercising his, her or its right either to accept or reject the Plan. A copy of the Plan is attached to this Disclosure Statement and is incorporated herein by this reference as **Exhibit "A"**.

**FOR THE REASONS SET FORTH HEREIN, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND TRUSTEE RECOMMEND THAT HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

Your acceptance of the Plan is important. In order for the Plan to be deemed "accepted" by creditors, at least sixty six and two-thirds percent (66 2/3%) in amount of Allowed Claims and a majority in number of Allowed Claims voting in each class of Claims must accept the Plan. As set forth in Section 4.5 of the Plan, all Interests will be deemed cancelled as of the Effective

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in Article I of the Plan.

Date, and Holders of Interests will receive no distributions under the Plan. Accordingly, Holders of Interests are deemed to reject the Plan and are not entitled to vote. Whether or not you expect to be present at the hearing to consider confirmation of the Plan, you are urged to fill in, date, sign and properly mail the ballot accompanying the Plan and this Disclosure Statement to James E. Van Horn, Esq., Barnes & Thornburg, LLP, 1717 Pennsylvania Avenue, N.W., Suite 500, Washington, D.C. 20006-4623; or via e-mail at jvanhorn@btlaw.com. For your vote to count, your ballot must be received by Mr. Van Horn prior to the date and time shown thereon.

**NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED BY THE COMMITTEE OR THE TRUSTEE OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN.**

**THE COMMITTEE AND TRUSTEE DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT IS AN INTEGRAL PART OF THE DISCLOSURE STATEMENT, AND EACH CREDITOR IS URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT.**

## II.    DEFINITIONS

Unless otherwise indicated, by context or otherwise, undefined capitalized terms appearing in this Disclosure Statement shall have the meanings ascribed to them under Article I (Definitions), Section 1.1 through 1.84 of the Plan. *See* **Exhibit "A"** attached hereto.

## III.    EVENTS LEADING TO BANKRUPTCY FILINGS

Rooftop International's business historically consisted of consumer friendly remote-controlled quadcopters, helicopters, and drones. Many of the products incorporated proprietary intellectual property manifesting in advanced technological features such as laser battling and built-in HD cameras.  The products appealed to adults and hobbyists, in addition to toy customers, and its product suite generally sold for less than $200 thereby offering affordable quality and performance.   The products were sold almost entirely under the trademarked Propel RC® brand.

In January 2015, Rooftop International acquired the Propel business previously owned by Asian Express Holdings Ltd., using Rooftop Group USA, Inc. as its agent for domestic U.S. sales.  Rooftop International is the parent company with 100% ownership of the following subsidiary companies reflected in the chart below.



Rooftop Group Services (US), Inc. is the agent for Rooftop International's North American sales. Rooftop Group USA, Inc. is an agent of Rooftop Group Services (US), Inc. Customer purchase orders were made with Rooftop Group USA, Inc. who processed orders on behalf of Rooftop Group Services (US), Inc. Asian Express Holdings Ltd. is an agent of Rooftop International. Customer purchase orders were made with Asian Express Holdings Ltd. who processed orders on behalf of Rooftop International. Since its formation, Rooftop International customarily and routinely represented itself and all of its subsidiaries as one enterprise to potential investors, lenders and the marketplace.

Rooftop International and its subsidiaries (collectively, the "Rooftop Companies") experienced highly profitable growth from 2015-2017:

In 2015, Rooftop Companies had **$42.4 million in gross sales** and $8.1 million in EBITDA. The gross sales amount of $42.4 million was reported in Rooftop Companies' audited financial statements for 2015 and was also reported by Rooftop Companies in their October 2017 Offering Memorandum. EBITDA of $8.1 million was reported by Rooftop Companies in the October 2017 Offering Memorandum.

In 2016, Rooftop Companies' **gross sales nearly doubled to $81.6 million** with EBITDA of $17.9 million including management adjustments of $9.8 million for non-recurring expenses. The gross sales amount of $81.6 million was reported in Rooftop Companies' audited financial statements for 2016 and was also reported by Rooftop Companies in the October 2017 Offering Memorandum and in their January 2018 Investor Presentation. EBITDA of $17.9 million was reported by Rooftop Companies in the October 2017 Offering Memorandum, and was reported as $8.2 million in the January 2018 Investor Presentation. Rooftop Companies' audited financial statements for 2016 also reported **$97.2 million of total assets, of which $92.2 million were current assets**, including $2.0 million in cash, $25.2 million of accounts receivable, $43.8 million of inventory, and $21.2 million of other current assets.

In 2017, Rooftop Companies' **gross sales once again nearly doubled year-over-year to $149.6 million.** This was the gross sales amount Rooftop Companies reported in the January 2018 Investor Presentation, which followed Rooftop Companies' expectation of $160.9 million in gross sales it projected in the October 2017 Offering Memorandum.

In the October 2017 Offering Memorandum, Rooftop Companies projected the following gross sales and EBITDA for 2018 – 2022:

|  | **Gross Sales** | **EBITDA** |
|---|---|---|
| 2018 | $191.2 million | $26.1 million |
| 2019 | $262.1 million | $46.8 million |
| 2020 | $327.6 million | $65.6 million |
| 2021 | $360.3 million | $74.1 million |
| 2022 | $378.4 million | $77.8 million |

In the October 2017 Offering Memorandum, Rooftop Companies reported **$128.3 million in total assets as of October 31, 2017, of which $121.0 million were current assets** including $23.3 million in cash, $33.6 million of accounts receivables, $41.1 million of inventory, and $23.0 million of other current assets.

In 2015, Rooftop Companies obtained a licensing arrangement with Warner Brothers to create and sell a Batman themed flying toy drone, which was shortly followed by the award of a similar arrangement with Disney's Star Wars franchise beginning in 2016.

To finance the anticipated increase in production for these new products, throughout 2016 Rooftop International obtained various secured and unsecured loans totaling more than $50 million from (i) Polar Ventures Overseas Limited ($15.9 million); (ii) Triumphant Gold Limited ($10 million); (iii) UOC SPV1 Pte. Ltd. ($20 million); and (iv) Begaline Ltd. ($6 million).

According to Rooftop International [Docket No. 36 in the Rooftop International case], financial distress began in late 2016 when the launch of the Star Wars drones was postponed until September 2017, and the resulting delay in fulling 2016 purchase orders and sales caused significant liquidity issues. Between June – August 2017, Polar Ventures Overseas Limited loaned Rooftop International an additional $9.75 million, and Triumphant Gold Limited loaned Rooftop International an additional $11.25 million.

When the Star Wars drones did finally launch in stores in September 2017, sales were significantly lower than anticipated. During this time Rooftop Group USA, Inc.'s inventory purchases were factored through a purchase order financing arrangement with Star Funding, Inc., which would pay suppliers directly for manufactured product, take ownership of the inventory and collect the proceeds from fulfilled purchase orders. After retaining its costs and commissions, Star Funding, Inc. would remit the balance to Rooftop Group USA, Inc. which used the funds to repay suppliers, employees and other trade vendors. According to Rooftop International [Docket No. 36 in the Rooftop International case], as gross receipts from sales continued to decline, suppliers began requiring Star Funding, Inc. to repay portions of old debts

as a condition of fulfilling new purchase orders, and this resulted in wiping out nearly all of the remaining liquidity of both Rooftop International and Rooftop Group USA, Inc.

On February 14, 2019, Rooftop International entered into a nonexclusive license agreement with Amax Industrial Group China Co, Ltd to use certain of its trademarks to manufacture Propel-RC-branded drones. Rooftop International receives a royalty rate of 3.5% and estimates that this license agreement will generate $0.8 to $1.2 million in royalty revenue annually. This implies annual sales revenue ranging from $22.9 million to $34.3 million.

Rooftop International alleged that, as of its Petition Date, it effectively has no other current operations or employees, and as of the Petition Date its assets consisted of intellectual property, a small amount of inventory in warehouses located in Dallas, TX, Seattle, WA, and Vancouver, B.C.

On June 20, 2018, in an effort to defend against certain legal collection efforts in Singapore that had been commenced by Triumphant Gold Limited against Rooftop International, certain Rooftop International affiliates and Darren Matloff, Rooftop International instituted a Singapore arbitration matter in the Singapore International Arbitration Centre wherein Rooftop International alleged that certain loan agreements with Triumphant Gold Limited were procured under economic distress and that the debt service was usurious. This Singapore arbitration matter stayed certain of Triumphant Gold Limited's legal collection efforts against Rooftop International, its affiliates and Mr. Matloff.

On April 22, 2019, an arbitration award was entered against Rooftop International wherein the arbitrator determined that Rooftop International's claims should be dismissed and validated the terms of Triumphant Gold Limited's loans to Rooftop International. As a result of this arbitration award, certain of Triumphant Gold Limited's legal collection efforts against Rooftop International, certain of its affiliates and Mr. Matloff, were no longer stayed.

Eight (8) days after the arbitration award was entered against Rooftop International, on April 30, 2019, Rooftop International filed a voluntary petition for Chapter 11 under the Bankruptcy Code. Rooftop International's stated reasons for filing the Rooftop International Chapter 11 Case was to receive the benefit of the automatic stay and the "breathing spell" from various legal actions certain creditors had commenced, and to preserve the remaining business for the benefit of creditors [Docket No. 36 in the Rooftop International case].

OnBased on Rooftop International's post-bankruptcy assertion of the separateness of Rooftop USA and Rooftop Services' assets from its own, the Bankruptcy Court confirmed after an August 16, 2019 hearing that the automatic stay did not apply to prevent creditor action against Rooftop USA, Rooftop Services, or any other non-debtor affiliates of Rooftop International. In a stated effort to protect and preserve the assets of Rooftop USA and Services from further dissipation, creditor Triumphant Gold Limited instituted an action in Texas state court when it filed its Original Petition and Application for Temporary Restraining Order, Cause No. DC-19-12093, on August 19, 2019 in the 101st Judicial District for Dallas County (the "State Court Action"). On the same date, a Temporary Restraining Order was issued in the State Court Action to protect the assets of Rooftop USA and Services. Following the service of initial

discovery requests in the State Court Action, on August 25, 2019, Rooftop USA and Rooftop Services each filed voluntary petitions under chapter 7 of the United States Bankruptcy Code.

On April 30, 2020, the Committee and Chapter 7 Trustee for both Rooftop Services and Rooftop USA filed a Joint Motion to Convert Rooftop Services [Docket Nos. 41, 42] and Rooftop USA [Docket Nos. 52, 53] cases to Chapter 11, and for the Appointment of a Chapter 11 Trustee in both cases. By Order entered May 7, 2020, the Bankruptcy Court granted the Joint Motion and entered an Order converting Rooftop Services [Docket Nos. 45, 46] and Rooftop USA [Docket Nos. 56, 57] to cases under Chapter 11 and directing the Office of the United States Trustee to appoint a Chapter 11 Trustee. On May 12, 2020, the Office of the United States Trustee appointed Daniel J. Sherman as the Chapter 11 Trustee in both Rooftop Services [Docket No. 50] and Rooftop USA [Docket No. 60] cases.

Notwithstanding the fact that Rooftop Companies (i) projected gross sales of $160.9 million in 2017 in the October 2017 Offering Memorandum, and (ii) disclosed $149.6 million in expected 2017 gross sales in the January 2018 Investor Presentation, Rooftop International reported **gross revenue in 2017 of only $31.9 million in its Statement of Financial Affairs** [Docket No. 37 in the Rooftop International case]; Rooftop USA reported **gross revenue in 2017 of only $12.2 million in its Statement of Financial Affairs** [Docket No. 18 in the Rooftop USA case]; and Rooftop Services reported **gross revenue in 2017 of only $680,366 in its Statement of Financial Affairs** [Docket No. 16 in the Rooftop Services case].

Rooftop International further reported in its Statement of Financial Affairs **gross revenue in 2018 of only $240,663, and gross revenue from January 1, 2019 through April 30, 2019 of $49,963**. Rooftop USA reported in its Statement of Financial Affairs **gross revenue in 2018 of only $10.2 million, and gross revenue from January 1, 2019 through August 25, 2019 of $3.6 million**. Rooftop Services reported in its Statement of Financial Affairs **gross revenue in 2018 of only $236,363, and gross revenue from January 1, 2019 through August 25, 2019 of only $281,091.**

Rooftop International also reported in its Schedules of Assets and Liabilities **assets consisting of $7,065.71 in cash and an unknown value attributable to its ownership of subsidiaries and its intellectual property as of the Petition Date, only 18 months after Rooftop Companies reporting $128.3 million in total assets.** Rooftop USA reported in its Schedules of Assets and Liabilities **assets consisting only of $147,357 in cash**; and Rooftop Services reported in its Schedules of Assets and Liabilities **assets consisting only of $85,000 in cash.**

The Committee believes that other factors may have contributed to the Debtors having to file their bankruptcy cases beyond those factors the Debtors have alleged. The Committee has commenced an investigation to identify and assess these factors, as well as what related and other viable Causes of Action exist, including, but not limited to, preferential and fraudulent transfers, which would constitute additional assets of the Debtors' bankruptcy Estates and additional sources of recovery for creditors.

## IV. THE BANKRUPTCY CASES AND RELATED PROCEEDINGS

**Rooftop International:** Since the Petition Date, Rooftop International has continued in possession of its property and operated as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) & 1108. The following is a summary of significant events in Rooftop International's bankruptcy case leading to the filing of the Plan.

### A. Appointment of Creditors' Committee and Committee Professionals

On June 13, 2019 the Office of the United States Trustee filed its Appointment of the Official Unsecured Creditors' Committee [Docket No. 24] thereby appointing the Committee in the Chapter 11 Case. On September 27, 2019 the United States Trustee filed its Second Amended Appointment of the Official Unsecured Creditors' Committee [Docket No. 117], appointing the five members who comprise the Committee in its current form: Brian Dlugash, PICA Australia Pty., Ltd., Begaline Limited, Polar Ventures Overseas Limited, and Chiat Thian Chew.

On September 4, 2019, the Committee filed the Application for Entry of an Order Authorizing the Retention and Employment of Barnes & Thornburg LLP as Co-Counsel to the Committee Effective as of August 15, 2019 [Docket No. 103]. By Order entered October 2, 2019, the Bankruptcy Court authorized the Committee to retain and employ Barnes & Thornburg LLP as co-counsel [Docket No. 120]. Contact information for the Committee's co-counsel is as follows:

James E. Van Horn
BARNES & THORNBURG LLP
1717 Pennsylvania Avenue NW, Suite 500
Washington, D.C. 20006-4623
Telephone: 202-371-6351
Facsimile: 202-289-1330
Email: jvanhorn@btlaw.com

On September 4, 2019, the Committee filed the Application to Employ Ross & Smith, PC as Co-Counsel for the Committee Effective as of August 15, 2019 [Docket No. 102]. By Order entered October 2, 2019, the Bankruptcy Court authorized the Committee to employ Ross & Smith, PC as co-counsel. Contact information for the Committee's co-counsel is as follows:

Judith W. Ross
State Bar No. 21010670
Rachael L. Smiley
State Bar No. 24066158
ROSS & SMITH, PC
700 North Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: judith.ross@judithwross.com

rachael.smiley@judithwross.com

On December 5, 2019, the Committee filed the Application to Employ KRyS Global USA, Inc. as Financial Advisor for the Committee Effective as of November 26, 2019 (the "KRyS Global Application") [Docket No. 146]. On December 26, 2019, the Debtor filed a response opposing the KRyS Global Application [Docket No. 152]. On January 16, 2020, the Bankruptcy Court entered an Order Granting the KRyS Global Application [Docket No. 166].

### B. Debtor's Engagement of Professionals

On May 29, 2019, Rooftop International filed the Application for Authorization to Employ and Compensate Reed Smith LLP as Bankruptcy Counsel for the Debtor [Docket No. 20]. By Order entered July 22, 2019, the Bankruptcy Court authorized Rooftop International to employ and compensate Reed Smith LLP as bankruptcy counsel [Docket No. 55]. On January 8, 2020, Michael P. Cooley of Reed Smith filed a Supplemental Declaration disclosing that on or about January 2, 2020, Reed Smith agreed to undertake a limited representation of Darren Matloff in connection with the objections to his discharge and certain exemptions asserted in the adversary proceeding styled *Triumphant Gold Limited v. Darren Scott Matloff,* Adv. No. 19-04127, and that Reed Smith does not otherwise represent Mr. Matloff in his chapter 7 case or in any other matter [Docket No. 157]. Contact information for Rooftop International's counsel is as follows:

Michael P. Cooley (SBN 24034388)
Lindsey L. Robin (SBN 24091422)
REED SMITH LLP
2501 N. Hardwood Street, Suite 1700
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
mpcooley@reedsmith.com
lrobin@reedsmith.com

### C. Rooftop International's Proposed Sale of Assets

On July 3, 2019 [Docket No. 44], the Rooftop International filed a Motion for an Order (a) Authorizing a Public Auction for the Sale of Certain Assets Free and Clear of All Liens, Claims and Encumbrances, (b) Approving Procedures for the Solicitation of Bids; (c) Approving the Stalking Horse Bid and Related Bid Protections; (d) Authorizing the Sale of Assets; and (e) Granting Related Relief (the "Sale Motion"), pursuant to which Rooftop International sought to sell by auction substantially all its assets, principally including all of Rooftop International's patents, trademarks, and other intellectual property and related licenses or other executory contracts and unexpired leases. On July 30, 2019 [Docket No. 67], the Committee filed a letter with the Bankruptcy Court supporting Rooftop International's proposed bid procedures but expressing concern that the stalking horse bid was very low, and stating the Committee's belief that it may be possible for Rooftop International to generate a greater recovery for unsecured creditors by licensing its intellectual property rather than selling it, and reserving all rights to take

a position for or against any sale that may be proposed. The hearing on the Sale Motion scheduled for August 1, 2019 was continued to September 16, 2019.

On September 13, 2019 [Docket No. 109], the Committee filed an Objection to the Sale Motion, on the grounds, among other reasons, that it was highly unlikely, if not impossible, for t Rooftop International to reorganize as a going concern if substantially all of its assets were sold; as well as various issues and concerns surrounding Rooftop International's proposed stalking horse bidder, Fortune 8, including, but not limited to, numerous loans, payments and business transaction by and among Fortune 8, Rooftop International, Rooftop International's principal Darren Matloff and certain debtor affiliates. The hearing on the Sale Motion scheduled for September 16, 2019 was continued to October 23, 2019.

On October 18, 2019 [Docket No. 129], the Committee filed a Supplemental Objection to the Sale Motion, which included as an exhibit a draft Plan term sheet prepared by the Committee. The hearing on the Sale Motion scheduled for October 23, 2019 was continued to a later date to be determined, and no hearing on the Sale Motion is currently scheduled.

### D.     Plan Exclusivity Period

Pursuant to 11 U.S.C. § 1121(b), Rooftop International had the exclusive right after the Petition Date to file a plan of reorganization for an initial 120-day period ending August 28, 2019. On August 6, 2019 [Docket No. 73], Rooftop International filed the Motion to Extend Time to File a Chapter 11 Plan ("First Exclusivity Motion"), pursuant to which Rooftop International sought to extend the exclusive period for it to file a plan to November 26, 2019. The Committee did not object to the extension requested by Rooftop International in the First Exclusivity Motion. On September 5, 2019, the Bankruptcy Court entered the Order granting the First Exclusivity Motion [Docket No. 106].

On November 5, 2019 [Docket No. 136], Rooftop International filed the Second Motion to Extend Time to File a Chapter 11 Plan ("Second Exclusivity Motion") pursuant to which Rooftop International sought to further extend the exclusive period for it to file a plan to January 20, 2020. On November 22, 2019, the Committee filed an objection to the extension requested by Rooftop International in the Second Exclusivity Motion [Docket No. 142]. On November 26, 2019, the Bankruptcy Court held a hearing on the Second Exclusivity Motion, and on December 3, 2019, the Bankruptcy Court entered the Order Denying the Second Exclusivity Motion [Docket No. 145].

### E.     Committee's Rule 2004 Motion

On December 18, 2019 [Docket No. 148], the Committee filed the Motion Pursuant to Bankruptcy Rule 2004 for an Order Authorizing and Directing Examination of, and Production of Documents from Rooftop International (the "Rule 2004 Motion"). On January 7, 2020, Rooftop International filed a response opposing the Rule 2004 Motion [Docket No. 156]. On January 16, 2020, the Bankruptcy Court entered an Order Granting the Rule 2004 Motion [Docket No. 167].

### F.     Original Plan

On February 16, 2020, the Committee filed its *First Amended Plan of Reorganization / Liquidation of Rooftop International Pte. Ltd. Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Official Committee of Unsecured Creditors* [Docket No. 177] and its *Disclosure Statement* in support of the Plan [Docket No. 178].

On February 25, 2020, the Court entered its *Order (i) Approving Disclosure Statement, (II) Approving the Procedures to Solicit Acceptances of the Plan of Reorganization/Liquidation, and (III) Scheduling a Hearing and Establishing Notices and Objection Procedures for Confirmation of the Plan of Reorganization/Liquidation* [Docket No. 181].

The Committee solicited its Original Plan, and all creditors in both impaired classes eligible to vote submitting ballots (collectively holding greater than $35 million in claims) unanimously voted in favor of the Original Plan [*see* Ballot Certification at Docket No. 198]. The deadline for voting and objecting to the Original Plan was April 13, 2020, and no parties objected or otherwise responded to the Original Plan. The confirmation hearing was originally scheduled for April 20, 2020 at 1:30 pm, CT in the Rooftop International case, however, on account of the outbreak of novel coronavirus, which causes the disease designated as COVID-19 (*see* General Order 2020-05, *Court Operations Under Exigent Circumstances Created by the COVID-19 Pandemic),* the confirmation hearing was continued to June 16, 2020 at 1:30 pm, CT.

### G.    Other Chapter 11 Matters

1.    On June 14, 2019 [Docket Nos. 26, 27], Triumphant Gold Limited filed a Motion to Dismiss Bankruptcy Filing, or alternatively to Lift the Automatic Stay (the "Motion to Dismiss").  On July 30, 2019 [Docket No. 67], the Committee filed a letter with the Bankruptcy Court opposing the Motion to Dismiss.  On August 19, 2019, the Bankruptcy Court entered an Order Denying the Motion to Dismiss [Docket ~~Nos~~No. ~~95, 96~~95].

2.    On July 10, 2019 [Docket No. 47], Triumphant Gold Limited filed a Motion for Order Declaring Automatic Stay Applies to Debtor Property under Affiliate Control ("Motion for Automatic Stay").    On ~~September 5,~~August 19, 2019, the Bankruptcy Court entered an Order Denying the Motion for Automatic Stay~~.~~ [Docket No. 96].

3.    On June 18, 2019, Rooftop International filed an application with the Singapore Court for recognition of the Chapter 11 Case as a foreign main proceeding under Singapore law.  On December 3, 2019, the Singapore Court issued a Judgment finding, among other things, that Rooftop International's Center of Main Interest is in Singapore and not the United States, and ordering (i) a moratorium on the commencement of proceedings against Rooftop International; (ii)  no resolution may be passed over the winding up of Rooftop International; and (iii) no proceedings may be commenced against any property of Rooftop International; with the exception that (x) the moratorium does not apply to Triumphant Gold Limited's enforcement of its share charge against Rooftop International; and (y) the stay of proceedings does not apply to Triumphant Gold Limited's guarantees from Asian Express Holdings Ltd. and Gandiva Investments Ltd for loans made to Rooftop International.

**Rooftop USA and Rooftop Services:** The following is a summary of significant events in Rooftop USA's and Rooftop Services' bankruptcy cases leading to the filing of the Plan.

### H. Rooftop USA Sale

On October 25, 2019, the Rooftop USA Chapter 7 Trustee filed a motion to sell certain inventory of drones and related equipment located in warehouses in Irving, Texas; Seattle, Washington and Vancouver, British Columbia, Canada [Docket No. 32 in the Rooftop USA case]. On November 13, 2019, the Bankruptcy Court entered an Order granting the Trustee's sale motion [Docket No. 39].

The Chapter 7 Trustee for both Rooftop Services and Rooftop USA has undertaken to collect the books and records of the Rooftop USA and Rooftop Services debtors, as well as investigate potential assets, including remaining accounts receivable that may be due and owing to the Debtors.

On January 15, 2020, creditor Triumphant Gold Limited filed its Unopposed Motions for Distribution of Property Pursuant to Bankruptcy Rule 6007 in the Rooftop USA and Rooftop Services cases based on its alleged secured claim to proceeds from accounts receivable. On February 14, 2020, the Court granted the Motions (which Order was later amended to reflect updated amounts received into the bankruptcy estates).

### I. Trustee's Engagement of Professionals

On September 17, 2019, the Rooftop Services Chapter 7 Trustee Daniel J. Sherman filed an application to retain Daniel J. Sherman and the Law Office of Sherman & Yaquinto, LLP as his counsel [Docket No. 13 in the Rooftop Services case]. By Order entered October 11, 2019, the Bankruptcy Court approved the application [Docket No. 23 in the Rooftop Services case].

On October 30, 2019, the Rooftop USA Chapter 7 Trustee Daniel J. Sherman filed an application to retain Daniel J. Sherman and the Law Office of Sherman & Yaquinto, LLP as his counsel [Docket No. 36 in the Rooftop USA case]. By Order entered November 25, 2019, the Bankruptcy Court approved the application [Docket No. 41 in the Rooftop USA case].

On January 9, 2020, the Chapter 7 Trustee filed an application to retain Sheldon Levy, CPA as Accountant in both Rooftop Services [Docket No. 30] and Rooftop USA [Docket No. 42] cases. By Order entered February 3, 2020, the Bankruptcy Court approved the application in both Rooftop Services [Docket No. 35] and Rooftop USA [Docket No. 46] cases.

### J. Chapter 11 Conversion and Appointment of Chapter 11 Trustee

On April 30, 2020, the Committee and Chapter 7 Trustee for both Rooftop Services and Rooftop USA filed a Joint Motion to Convert Rooftop Services [Docket Nos. 41, 42] and Rooftop USA [Docket Nos. 52, 53] cases to Chapter 11, and for the Appointment of a Chapter 11 Trustee in both cases. By Order entered May 7, 2020, the Bankruptcy Court granted the Joint Motion and entered an Order converting Rooftop Services [Docket Nos. 45, 46] and Rooftop USA [Docket Nos. 56, 57] to cases under Chapter 11 and directing the Office of the United States Trustee to appoint a Chapter 11 Trustee. On May 12, 2020, the Office of the United States

Trustee appointed Daniel J. Sherman as the Chapter 11 Trustee in both Rooftop Services [Docket No. 50] and Rooftop USA [Docket No. 60] cases.

### K. Joint Administration

On May 22, 2020, the Committee and Trustee filed an Unopposed Motion for Joint Administration of the three Chapter 11 Cases. By Order entered May 27, 2020, the Bankruptcy Court directed the joint administration of the Chapter 11 Cases [Docket No. 204].

## V. ASSETS, OPERATIONS AND LIABILITIES OF THE DEBTORS

**REFERENCE IN THIS DISCLOSURE STATEMENT TO THE AMOUNT OF ANY CLAIM IS NOT AN ADMISSION OR ACKNOWLEDGEMENT OF THE ALLOWED AMOUNT OF SUCH CLAIM, NOR IS REFERENCE TO THE VALUE OF ANY ASSET OR AMOUNT OF ANY CAUSE OF ACTION AN ADMISSION OF SUCH VALUE OR AMOUNT. NO CREDITOR SHOULD VOTE FOR THE PLAN ON THE ASSUMPTION THAT AN OBJECTION TO ITS, HIS OR HER CLAIM WILL NOT BE MADE.**

### A. Assets

1. Based upon the information currently available to the Committee, (A) Rooftop International's Assets consist primarily of (i) intellectual property; (ii) its ownership interest in various subsidiaries and affiliates; and (iii) Causes of Action; and (B) Rooftop Services' and Rooftop USA's Assets consist primarily of (i) accounts receivable (which may or may not be collectible); (ii) inventory; and (iii) Causes of Action.

2. As of April 30, 2020, Rooftop International reported cash in its account in the amount of $106,795.00 [Docket No. 202]. As of May 27, 2020, the Trustee has $14,470.00 in the Rooftop Services account, and $95,241.00 in the Rooftop USA account.

3. All Causes of Action shall be transferred to and vest in the Litigation Trust and administered by the Litigation Trustee pursuant to Section 5.4 of the Plan The Litigation Trustee shall pursue, settle, or release all Causes of Action, as appropriate, in accordance with the best interest of and for the benefit of the Creditors entitled to receive distributions under the Plan.

**In not describing any potential Causes of Action herein, the Committee and Trustee do not in any way intend to indicate that any Causes of Action do not exist, and the failure to include any description of specific Causes of Action in this Disclosure Statement should not be considered an admission or acknowledgement by the Committee or Trustee that any Causes of Action will not be pursued, since the Committee and Trustee have not fully investigated potential Causes of Action. All such Causes of Action will vest in the Litigation Trust and may be prosecuted by the Litigation Trustee on behalf of the Post-Confirmation Debtor after confirmation of the Plan. No holder of a Claim or Interest should vote to accept the Plan based upon the Committee's or Trustee's failure to describe or assert any Causes of Action not otherwise disclosed herein.**

### B. Operating Performance

While in Chapter 11, the Committee and Trustee are unaware of any operating performance by (i) Rooftop International other than collecting royalty revenue from the Amex Licensing Agreement; and (ii) Rooftop Services and Rooftop USA.

### C. Liabilities of the Debtors

#### 1. Administrative Claims Other Than Fee Claims

The Committee and Trustee anticipate that the Debtors will have only nominal unpaid Allowed Administrative Claims (other than Fee Claims), if any, as of the Effective Date.

#### 2. Fee Claims

The Committee and Trustee anticipate that the Debtors may have unpaid Allowed Fee Claims as of the Effective Date.

#### 3. Priority Claims

The Committee and Trustee do not believe that the Debtors will have any unpaid Allowed Priority Claims as of the Effective Date.

#### 4. Secured Claims

Certain creditors have filed secured claims in the Debtors' cases.

**Any such claim is secured only to the extent of the value of the collateral properly perfected and securing such claim, and nothing contained in this Disclosure Statement or any exhibit or attachment hereto shall be construed as an admission as to the value of any such collateral or the amount of any such secured claim, the Committee and Trustee reserve all rights as to such matters.**

#### 5. General Unsecured Claims

Rooftop International scheduled $59,910,238.06 owing on account of General Unsecured Claims as of the Petition Date [Docket No. 38 in the Rooftop International case], and the total amount of filed General Unsecured Claims against Rooftop International was approximately $78,200,000. Rooftop Services scheduled $25,590.00, in addition to various "unknown amounts" owing on account of General Unsecured Claims as of the Petition Date [Docket No. 15 in the Rooftop Services case], and the total amount of filed General Unsecured Claims against Rooftop Services was approximately $10,933,231.20. Rooftop USA scheduled $13,660,158.82 owing on account of General Unsecured Claims as of the Petition Date [Docket No. 17 in the Rooftop USA case], and the total amount of filed General Unsecured Claims against Rooftop Services was approximately $19,869.338.00.

## VI.     SUMMARY OF THE PLAN

THE FOLLOWING IS A SUMMARY OF THE PLAN. THIS SUMMARY IS MODIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS **EXHIBIT "A"**. TO THE EXTENT A CONFLICT EXISTS BETWEEN THIS SUMMARY AND THE TERMS OF THE PLAN, THE TEXT OF THE PLAN CONTROLS

### A.     Plan Concept

The Committee and Trustee seek to consummate the Restructuring on the Effective Date of the Plan.  In the event all conditions precedent to the Effective Date for the Plan necessary to consummate the Restructuring are not timely satisfied or waived by the Committee, the Committee and Trustee shall then seek to consummate the Liquidation on the Effective Date of the Plan.

The Committee and Trustee believe that the value of the Debtors' Assets can be best maximized through a Restructuring whereby the Debtors will be reorganized as a going concern.  If a Restructuring cannot be consummated, then alternatively the Committee and Trustee believe the value of the Debtors' Assets can be best maximized through an orderly liquidation as opposed to an immediate sale of the Assets by a Chapter 7 Trustee.  **See Exhibit "B"**.

Under either a Restructuring or a Liquidation, the Plan contemplates, and is predicated upon, the entry of an order, which may be the Confirmation Order, substantively consolidating the Debtors' Estates and the Chapter 11 Cases for administrative convenience and for purposes of implementing the Plan, voting, assessing whether the standards for Confirmation have been met, calculating and making Distributions under the Plan and filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee.

Under either a Restructuring or a Liquidation, a Litigation Trust shall be established and a Litigation Trustee appointed.  Subject to Bankruptcy Court approval, the Litigation Trustee shall be KRyS Global USA, Inc., and any successor trustee appointed pursuant to the Litigation Trust Agreement.  Pursuant to Section 5.4 of the Plan, the Litigation Trustee shall, among other things, commence and pursue Causes of Action.  Under either a Restructuring or a Liquidation, pursuant to Section 8.7 of the Plan, the Litigation Trustee shall, among other things, prosecute objections to Claims and compromise or settle any Claims (disputed or otherwise).

Under a Restructuring, the Post-Confirmation Debtor shall, among other things, (i) implement the Restructuring Transactions as described in Section 6.2 of the Plan; (ii) create a holding company ("Rooftop Holding Company") as its immediate parent; (iii) enter into New Secured Financing, as necessary; and Rooftop Holding Company shall issue or reserve for issuance New Common Stock for distribution in accordance with the terms of the Plan.

Under a Liquidation, the Plan Administrator shall, among other things, supervise the orderly liquidation of the Debtors' Assets.  Subject to Bankruptcy Court approval, the Plan

Administrator shall be KRyS Global USA, Inc., and any successor plan administrator duly appointed.

**B.      Payments to Creditors**

**1.      Secured Creditors**

Under the Plan, secured creditors will receive, at the election of the Committee, (i) deferred cash payments having a present value equal to the amount of its Allowed Class 2 Claim and retention of the liens securing such Claim to the extent of the allowed amount of such Claim; (ii) the "indubitable equivalent" of such Allowed Class 2 Claim; (iii) the distribution of the collateral securing such Allowed Class 2 Claim; or (iv) other mutually agreeable treatment on account of such Claim.  Any deficiency will be an unsecured claim (unless previously waived) which will share Pro Rata with other unsecured creditors. See Section E (Treatment of Claims) below.

**2.      Unsecured Creditors**

Under the Plan, unsecured creditors will receive Pro Rata distribution of (a) Net Proceeds from Causes of Action and (b) either (i) upon a Restructuring, the New Common Stock Distribution; or (ii) upon a Liquidation, Net Proceeds from such Liquidation.

**3.      Timing and Amount of Payments**

The timing and amount of a distribution will be decided by the Litigation Trustee or Plan Administrator, as applicable, who may consider factors such as the amount of funds on hand and future operating expenses.

**C.      The Status of the Debtors' Officers after Confirmation**

1.      After the Plan becomes effective, the terms of the current members of the board of directors of the Debtors shall expire, and either (a) under a Restructuring, the New Board shall be appointed; or (b) under a Liquidation, the Plan Administrator shall be deemed the sole shareholder, officer, and director of the Post-Confirmation Debtor.

2.      There is no current agreement between the Post-Confirmation Debtor, Litigation Trustee, or Plan Administrator, as applicable, and Darren Matloff, or any other officer, regarding the employment of Mr. Matloff or other officer after the Plan becomes effective. The Post-Confirmation Debtor, Litigation Trustee, or Plan Administrator, as applicable, may seek to employ Mr. Matloff or another officer on a salaried or consulting basis.  Under a Restructuring, Mr. Matloff and other officers may be entitled to participate in the Management Incentive Plan provided for in Section 6.6 of the Plan.

**D.      Plan Provisions Governing Classification and Treatment of Claims**

1.      **Unclassified Claims**.  Administrative Claims and Priority Tax Claims are not classified in the Plan. Holders of Allowed Administrative Claims and Allowed Priority Tax Claims shall be treated under the Plan as follows:

(a)     <u>Administrative Claims Other Than Fee Claims</u>. Except to the extent the Holder of an Allowed Administrative Claim agrees otherwise, each Holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim the full amount thereof, without interest, in Cash, as soon as practicable after the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Claim.

(b)     <u>Fee Claims</u>. All Professionals seeking allowance by the Bankruptcy Court of a Fee Claim (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by a date that is not later than the date that is forty-five (45) calendar days after the Effective Date; and (b) shall be paid by the Post-Confirmation Debtor, in such amounts as are approved by the Bankruptcy Court (i) upon the later of (x) the Effective Date and (y) ten (10) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Post-Confirmation Debtor.

(c)     <u>Priority Tax Claims</u>. Each Holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Priority Tax Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Claim or (b) such lesser amount as the Holder of an Allowed Priority Tax Claim and the Committee might otherwise agree or (c) at the election of the Post-Confirmation Debtor, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, in Cash, in up to twenty equal quarterly installments (and in such event, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claims at a rate to be agreed to by the Post-Confirmation Debtor and the appropriate governmental unit, or, if they are unable to agree, as determined by the Bankruptcy Court), commencing as soon as practicable after the later of (i) the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Claim.

2.     **Classification of Claims and Interests**

For purposes of the Plan, all other Claims and Interests are classified as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 – Priority Claims | Unimpaired | Not Entitled to Vote |
| Class 2 – Secured Claims | Impaired | Entitled to Vote |
| Class 3 – General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 – Interests | Impaired | Not Entitled to Vote |

E.     **Treatment of Claims**

1.     **Claims and Interests**.  The Debtors' obligations in respect of such Claims and Interests shall be satisfied in accordance with the terms of the Plan.  The Plan constitutes one Plan proposed by consolidated Rooftop Group Services (US) Inc. and each Claim filed or to be filed against any Debtor shall be deemed a single claim filed only against the consolidated Rooftop Group Services (US) Inc.

2.      **Class 1 Claims - Priority Claims**.  Class 1 Claims are Unimpaired.  Each Holder of an Allowed Class 1 Claim shall receive either (a) payment in full in Cash as soon as practicable after the later of (i) the Effective Date, and (ii) the date on which such Claim becomes an Allowed Claim or (b) as otherwise agreed by the Holder of such Allowed Class 1 Claim. The Holders of Claims in this Class are not entitled to vote.

3.      **Class 2 Claim - Secured Claims**.  Class 2 Claims are Impaired.  Each Holder of an Allowed Class 2 Claims shall receive, at the election of the Committee, (i) deferred cash payments having a present value equal to the amount of its Allowed Class 2 Claim and retention of the liens securing such Claim to the extent of the allowed amount of such Claim; (ii) the "indubitable equivalent" of such Allowed Class 2 Claim; (iii) the distribution of the collateral securing such Allowed Class 2 Claim; or (iv) other mutually agreeable treatment on account of such Claim.  The Holders of Claims in this Class are entitled to vote.

4.      **Class 3 Claims – General Unsecured Claims**.  Class 3 Claims are Impaired. After the payment or reserve for Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, and Plan Expenses, each Holder of an Allowed Class 3 Claim shall receive in respect of such Claim its Pro Rata distribution of (a) Net Proceeds from Causes of Action and (b) either (i) upon a Restructuring, the New Common Stock Distribution; or (ii) upon a Liquidation, Net Proceeds from such Liquidation.  The Holders of Claims in this Class are entitled to vote.

5.      **Class 4 - Interests**.  Class 4 Interests are Impaired. The Holders of Class 4 Interests shall receive no distribution. On the Effective Date, all Class 4 Interests shall be deemed canceled, null and void, and of no force and effect. The Holders of Class 4 Interests are deemed to reject the Plan and are not entitled to vote.

**F.      Means for Plan Implementation; General**

The following Sections F.1 - F.8 shall be applicable to either a Restructuring or a Liquidation

1.      **Restructuring or Liquidation**.  On the Effective Date, the Debtors will consummate either a Restructuring or a Liquidation in accordance with the terms of the Plan.

(a)      <u>Restructuring</u>.  If all of the conditions enumerated in Sections 10.2 and 10.3 of the Plan are timely satisfied or waived, then on the Effective Date the Debtors shall consummate the Restructuring, including all the terms of Article VI of the Plan.

(b)      <u>Liquidation</u>. If only the conditions enumerated in Section 10.2 of the Plan are timely satisfied or duly waived, then on the Effective Date the Debtors shall consummate the Liquidation, including all the terms of Article VII of the Plan.

2.      **Corporate Action**.  On the Effective Date and without further action by the Bankruptcy Court or any officer, director, or shareholder of a Debtor, each existing officer and director of each Debtor shall be deemed to have resigned their position.

3. **Substantive Consolidation**. The Plan contemplates, and is predicated upon, the entry of an order, which may be the Confirmation Order, substantively consolidating the Estates and the Chapter 11 Cases for administrative convenience and for purposes of implementing the Plan, voting, assessing whether the standards for Confirmation have been met, calculating and making Distributions under the Plan and filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee. Accordingly, on the Effective Date: (i) all Intercompany Claims and Interests held by, between and among the Debtors shall be deemed eliminated, (ii) all assets and liabilities of the Debtors shall be merged or treated as if they were merged with the assets and liabilities of Rooftop Group Services (US) Inc., (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other Debtors shall be deemed to be one obligation of Rooftop Group Services (US) Inc., and (iv) each Claim filed or to be filed against any Debtor shall be deemed filed only against the consolidated Rooftop Group Services (US) Inc., and shall be deemed a single Claim against and a single obligation of the consolidated Rooftop Group Services (US) Inc. On the Effective Date, in accordance with the terms of the Plan, all Claims based upon co-obligations or guarantees of collection, payment, or performance made by the Debtors as to the obligations of another Debtor shall be merged into a single obligation of Rooftop Group Services (US) Inc., and otherwise shall be released and of no further force and effect.

This substantive consolidation shall not otherwise affect (a) the vesting of assets in the Litigation Trust; (b) the right to Distributions from any insurance policies or proceeds of such policies; or (c) the rights of the Litigation Trustee to contest setoff or recoupment rights alleged by creditors on the grounds of lack of mutuality under Section 553 of the Bankruptcy Code and other applicable law. In addition, substantive consolidation shall not, and shall not be deemed to, prejudice any of (i) the Causes of Action, which shall survive for the benefit of the Debtors and their Estates and, upon the Effective Date, for the benefit of the Litigation Trust and its beneficiaries; or (ii) the available defenses to the Causes of Action.

4. **Causes of Actions**. On the Effective Date, all Causes of Action shall be transferred to and vest in the Litigation Trust and administered by the Litigation Trustee. The Litigation Trustee shall pursue, settle, or release all reserved Causes of Action for and on behalf of the Debtors' Estates and for the benefit of the Creditors entitled to receive distributions under the Plan. Any Net Proceeds of the Causes of Action received subsequent to the Effective Date shall be deposited into the Litigation Trust for distribution in accordance with the Plan and Litigation Trust Agreement. The Causes of Action and proceeds therefrom shall be transferred and assigned by the Debtors and their Estates (and deemed transferred) to the Litigation Trust free and clear of all Claims, Liens, charges, encumbrances, and rights and interests, without the need for any Entity to take any further action or obtain any approval and the Litigation Trust shall be authorized as the representative of the Estates to pursue the Causes of Action. In accordance with Section 1123(b) of the Bankruptcy Code, the Litigation Trustee shall have the exclusive right to commence and pursue, as appropriate, in his/her sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases, any and all Causes of Action, and the Litigation Trustee's right to commence, prosecute, or settle any such Causes of Action shall be preserved notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

Unless a Cause of Action against any Entity is expressly waived, relinquished, released, discharged, compromised or settled in the Plan or any Final Order (including the Confirmation Order), all Cause of Actions are expressly reserved and shall be vested in the Litigation Trust pursuant to the Plan, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to any Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, the Plan or the Confirmation Order or any other Final Order (including the Confirmation Order). In addition, the Litigation Trustee reserves the right to pursue or adopt any claims alleged in any lawsuit in which a Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

An initial list of the Causes of Action shall be included in the Plan Supplement. The failure to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by a Debtor or its Estate of such claim, right of action, suit or proceeding. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Causes of Action against them as any indication that the Litigation Trustee will not pursue any and all available Causes of Action against them. While the initial list included in the Plan Supplement provides notice to certain Persons and Entities of the existence of Causes of Action against them, it is not intended to limit the Causes of Action the Litigation Trustee may prosecute as others may be discovered after the Plan Supplement is filed.

5. **Litigation Trust**. The Litigation Trust shall be established and shall become effective on the Effective Date. The Litigation Trust shall be governed and administered in accordance with the Plan and the Litigation Trust Agreement. The Litigation Trust Oversight Board shall (i) be selected by the Committee; (ii) consist of three (3) members; (iii) be governed in accordance with the Litigation Trust Agreement; and (iv) be included in the Plan Supplement. The Litigation Trustee shall have the exclusive right to (a) prosecute objections to Claims on behalf of the Post-Confirmation Debtor and compromise or settle any Claims (disputed or otherwise); and (b) commence and pursue Causes of Action as described in Section 5.4 of the Plan. The Litigation Trustee shall have the authority to employ and compensate any and all such professionals as the Litigation Trustee, in his or her sole discretion, deems reasonably necessary to perform his or her duties under the Plan, including any professional that represented a party in the Chapter 11 Cases, without further order of the Bankruptcy Court. The Litigation Trustee may, without application to or approval of the Bankruptcy Court, pay the charges that he or she incurs after the Effective Date for professional fees and expenses that, but for the occurrence of the Effective Date, would constitute Allowed Fee Claims or Allowed Administrative Claims. The Litigation Trustee shall have the authority to obtain financing, including contingent fee arrangements, sufficient to undertake the various actions contemplated by the Litigation Trustee and perform his or her duties in accordance with the Plan and the Litigation Trust Agreement, without application to or approval of the Bankruptcy Court.

6. **Post-Effective Date Professional Fees and Expenses**. Professionals that perform post-Effective Date services for the Post- Confirmation Debtor, Litigation Trustee or the Plan Administrator shall provide monthly invoices to the Post-Confirmation Debtor, Litigation Trustee or Plan Administrator, as applicable, describing the services rendered and the fees and

expenses incurred in connection therewith, on or before the 20th day following the end of the calendar month during which such services were performed. Professionals who tender such invoices shall be paid by the Post-Confirmation Debtor, Litigation Trustee or Plan Administrator, as applicable, for such services from the Plan Expense Reserve Fund on or after the date that is fifteen (15) days after the submission to the Post-Confirmation Debtor, Litigation Trustee or Plan Administrator, as applicable by such professionals of said monthly invoices, unless, within said fifteen (15) day period, a written objection to said payment is made, in which event such payment shall be made only upon either (a) agreement of the parties or (b) Order of the Bankruptcy Court.

7.      **Dissolution of Committee**.  Upon the occurrence of the Effective Date, the Committee shall be dissolved, and each individual member and any retained Professional shall be discharged from any further activities in the Chapter 11 Cases. The Professionals retained by the Committee and the members thereof will not be entitled to assert any Fee Claims for services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date for services provided prior to the Effective Date.

8.      **Discharge of Trustee**.  Upon the occurrence of the Effective Date, the Trustee's appointment as Chapter 11 Trustee for Rooftop Group USA, Inc. and Rooftop Group Services (US) Inc. shall terminate, and any Professional retained by the Trustee shall be discharged from any further activities in the Chapter 11 Cases. The Professionals retained by the Trustee thereof will not be entitled to assert any Fee Claims for services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date for services provided prior to the Effective Date.

G.      **Means for Plan Implementation; Restructuring**

If the Financing Condition **IS** timely satisfied or waived, the Debtors shall consummate the Restructuring transactions and the following Sections G.1 – G.14 shall apply.  In that event, Sections H.1 – H.8 below shall not apply and shall be of no further force or effect.

1.      **The New Board**.  On the Effective Date, and without any further action by the Bankruptcy Court or any officer, director, or shareholder of a Debtor, the New Board shall be appointed.

2.      **Restructuring Transactions**.      On the Effective Date, the Post-Confirmation Debtor shall be authorized to implement, and shall implement, the Restructuring Transactions.  The actions to implement the Restructuring Transactions may include: (a) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, interest, or right consistent with the terms of the Plan; (b) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to

applicable state law; (c) obtaining New Secured Financing; (d) issuing or reserving for issuance New Common Stock; (e) entering into employment agreements with members of management; (f) creation of the Litigation Trust and (g) all other actions that the Post-Confirmation Debtor determines to be necessary or appropriate and consistent with the Plan and Confirmation Order.

3.      **New Secured Financing**.  The Post-Confirmation Debtor, a Debtor, or Debtors, at the direction of the Committee, as applicable, shall be authorized to enter into New Secured Financing Documents on or before the Effective Date in an amount sufficient to consummate the Restructuring.  On the Effective Date, the New Secured Financing Documents shall constitute legal, valid, binding, and authorized obligations of either the Post-Confirmation Debtor or the Debtors as applicable, and following the consummation of the Restructuring Transactions, the New Secured Financing Documents shall constitute legal, valid, binding, and authorized obligations of the Post-Confirmation Debtor, enforceable in accordance with their terms.  The financial accommodations to be extended under the New Secured Financing Documents are being extended and shall be deemed to have been extended in good faith and for legitimate business purposes and are reasonable and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable nonbankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Secured Financing Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the New Secured Financing Documents, (c) shall be deemed automatically perfected on the Effective Date (without any further action being required by a Debtor, the Post-Confirmation Debtor, as applicable, the applicable agent, or any of the applicable lenders), having the priority set forth in the New Secured Financing Documents and subject only to such Liens and security interests as may be permitted under the New Secured Financing Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors, the Post-Confirmation Debtor, as applicable, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

4.      **New Common Stock**.  On the Effective Date, Rooftop Holding Company shall issue or reserve for issuance all of the New Common Stock issued or issuable in accordance with the terms of the Plan, subject to dilution on the terms described herein. The issuance of the New Common Stock for distribution under the Plan is authorized without the need for further corporate action, and all of the shares of New Common Stock issued or issuable under the Plan shall be duly authorized and validly issued, fully paid, and non-assessable.

5.     **Stockholders Agreement**.  On the Effective Date, the Post-Confirmation Debtor and the Holders of the New Common Stock shall enter into the Stockholders Agreement in substantially the form included in the Plan Supplement if one is included therein. The Stockholders Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of the New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than the Post-Confirmation Debtor.

6.     **Management Incentive Plan**.  On the Effective Date, up to 10% of the New Common Stock will be reserved for issuance under the Management Incentive Plan to directors, officers, and key employees of the Post-Confirmation Debtor (each, a "***MIP Participant***"). The form, terms, allocation, and vesting applicable to the Management Incentive Plan shall be determined by the New Board.

7.     **Senior Management**.  The initial members of the Post-Confirmation Debtor's senior management and initial officers shall be selected by the Committee and included in the Plan Supplement.

8.     **Continued Corporate Existence**.  Except as expressly provided in the Plan, each Debtor shall continue to exist as of the Effective Date as a separate corporate entity, with all the powers of such corporate entity, under the applicable law in the jurisdiction in which the Debtor is incorporated.  The Post-Confirmation Debtor shall create a holding company as its immediate parent ("***Rooftop Holding Company***") to act as the issuer of equity securities to the public, including to Holders entitled to receive New Common Stock under the Plan. Therefore, in lieu of shares of the Post-Confirmation Debtor, Holders should expect to receive Rooftop Holding Company stock.  It is currently anticipated that Rooftop Holding Company will conduct no operations and hold no assets other than 100% of the shares of the Post-Confirmation Debtor.

9.     **Vesting of Assets in the Post-Confirmation Debtor**.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by the Debtors under the Plan shall vest in the Post-Confirmation Debtor free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Confirmation Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  For avoidance of doubt, the Causes of Action shall vest and be transferred to the Litigation Trust and administered by the Litigation Trustee pursuant to Section 5.4 of the Plan.

10.     **Cancellation of Security Interests and Other Interests**.  On the Effective Date, (i) all security interests and/or Liens granted by a Debtor to any Entity shall be automatically released, discharged, terminated, and of no further force and effect; and (ii) all Interests, shall be deemed canceled, null and void, and of no further force and effect.

11.     **Exemption from Registration Requirements; Trading of Securities**.  The offering, issuance, and distribution of New Common Stock  issued under the Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act

under Section 1145(a)(1) of the Bankruptcy Code.  Except as otherwise provided in the Plan or the governing certificates or instruments, any and all New Common Stock  issued under the Plan will be freely tradable under the Securities Act by the recipients thereof, subject to: (1) the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, and compliance with any applicable individual state securities laws ("Blue Sky Laws") or foreign securities laws, if any, and any rules and regulations of the Securities Exchange Commission, if any, applicable at the time of any future transfer of such New Common Stock or instruments; (2) the restrictions, if any, on the transferability of such New Common Stock and instruments provided by law; and (3) any other applicable regulatory approvals and requirements.

The Committee, the Trustee, the Debtors and the Post-Confirmation Debtor are not able to determine the availability of state securities laws exemptions for an issuance to a particular Holder.  Certain states do not provide exemptions for offerings relying on a federal private placement exemption and, in such states, state securities laws requirements must be met. Accordingly, there can be no assurance that a state securities law exemption will be available in a particular state for a Holder receiving New Common Stock under the Plan, which may necessitate one or more state securities filings on behalf of such Holder to comply with state securities laws.

12. **Organizational Documents**.  Subject to Article VI of the Plan, the Post-Confirmation Debtor and Rooftop Holding Company shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan. Under Section 1123(a)(6) of the Bankruptcy Code, the organizational documents of the Post-Confirmation Debtor will prohibit the issuance of non-voting Equity Securities. After the Effective Date, the Post-Confirmation Debtor and Rooftop Holding Company, as applicable, (i) will amend and restate their organizational documents; and (ii) will file their certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the organization documents.

13. **Exemption from Certain Transfer Taxes and Recording Fees**.  To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to the Post-Confirmation Debtor or to any Entity under, in contemplation of, or in connection with the Plan or under: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in a Debtor or the Post-Confirmation Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the

24

foregoing instruments or other documents without the payment of any such tax or governmental assessment.

14. **Discharge of Claims**. Except as otherwise provided herein or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts and Claims and terminate all Interests of any kind, nature, or description whatsoever against or in a Debtor or any of a Debtor's assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the occurrence of the Effective Date, all existing Claims against and Interests in a Debtor, shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests shall be precluded and enjoined from asserting against the Debtors, the Post-Confirmation Debtor, or its successors or assigns, or any of its assets or properties, any other or further Claim or Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim or proof of Interest and whether or not the respective facts or legal bases were known or existed prior to the Effective Date.

### H. Means for Plan Implementation; Liquidation

> If the Financing Condition **IS NOT** timely satisfied or waived, the Debtors shall consummate the Liquidation transactions and the following Sections H.1 – H.8 shall apply. In that event, Sections G.1 - G.14 above shall not apply and shall be of no further force or effect.

1. **Corporate Action**. On the Effective Date and without further action by the Bankruptcy Court or any officer, director, or shareholder of the Debtors, the Plan Administrator shall be deemed the sole shareholder, officer, and director of the Post-Confirmation Debtor. The Plan will be administered by the Plan Administrator, and all actions taken thereunder in the name of the Post- Confirmation Debtor shall be taken through the Plan Administrator.

2. **Plan Administrator**. On the Effective Date, the Plan Administrator shall begin acting for the Post-Confirmation Debtor in the same fiduciary capacity as applicable to a board of directors, subject to the provisions hereof. The Plan Administrator shall be compensated at his, her, or its normal and customary rates and may be paid without further order of the Bankruptcy Court in accordance with Section 7.6(c) of the Plan. The Plan Administrator shall be entitled to reimbursement for his actual, reasonable, and necessary expenses incurred in connection with the performance of his duties, including, but not limited to, attorneys' fees and expenses, accounting fees and expenses and other professional fees and expenses, without the need for further Bankruptcy Court approval. The Plan Administrator shall not be liable for any action he or she takes or omits to take that he or she believes in good faith to be authorized or within his or her rights or powers, absent gross negligence or willful misconduct on his or her part. All distributions to be made to Creditors under the Plan shall be made by the Plan Administrator, who shall deposit and hold all Cash in trust for the benefit of Creditors (including Professionals) receiving distributions under the Plan. Subject to the review of the Oversight Committee as described in Section 7.6 of the Plan, the duties and powers of the Plan Administrator shall include the following:

(a)     To continue operating the Debtors' businesses to the extent necessary to conduct an orderly liquidation of the Assets including, but not limited to, the collection and receipt of revenues from contracts and agreements, including, but not limited to, royalty revenue from licensing agreements, or sale of Property, and any other action that the Plan Administrator may deem necessary and appropriate to maximize the value of and return on the Debtors' Assets;

(b)     To exercise all power and authority that may be exercised, to commence all proceedings (including the power to continue any actions and proceedings that may have been commenced by a Debtor or the Committee or the Trustee prior to the Effective Date) that may be commenced, and to take all actions that may be taken by any officer, director, or shareholder of the Post-Confirmation Debtor with like effect as if authorized, exercised, and taken by unanimous action of such officers, directors, and shareholders, including consummating the Plan and all transfers thereunder on behalf of the Post-Confirmation Debtor;

(c)     To maintain all accounts, make distributions, and take other actions consistent with the Plan, including the maintenance of appropriate reserves, in the name of the Post- Confirmation Debtor;

(d)     To take all steps necessary to terminate the corporate existence of the Debtors;

(e)     To collect the accounts receivable, if any, of the Debtors;

(f)     To employ and compensate any and all such professionals as the Plan Administrator, in his or her sole discretion, deems reasonably necessary to perform his or her duties under the Plan, including any professional that represented a party in the Chapter 11 Cases, without further order of the Bankruptcy Court; and

(g)     To take all other actions not inconsistent with the provisions of the Plan that the Plan Administrator deems reasonably necessary or desirable in connection with the administration of the Plan, including, without limitation, filing all motions, pleadings, reports, and other documents in connection with the administration and closing of the Chapter 11 Cases.

3.     **Resignation, Death, or Removal**.  The Plan Administrator may be removed by order of the Bankruptcy Court upon notice and motion by an Oversight Committee member for good cause shown. In the event of removal for good cause shown of the Plan Administrator, or in the event of the death or incapacity of the Plan Administrator, the Oversight Committee shall appoint a successor upon notice, motion, and approval of the Bankruptcy Court. In the event of the resignation of the Plan Administrator, the Plan Administrator shall nominate a successor, which nomination shall be deemed accepted by the Oversight Committee and shall be deemed effective upon the filing with the Bankruptcy Court of a Notice of Appointment of Successor Plan Administrator. The successor Plan Administrator without any further act shall become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor. In the absence of any pending action to remove a Plan Administrator for good cause,

any resigning Plan Administrator, without further action, order, or decree, shall be deemed released by the Post-Confirmation Debtor from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence in connection with the Chapter 11 Cases; provided, however, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or the gross negligence of the Plan Administrator unless the Plan Administrator acted in good faith and in a manner that the Plan Administrator reasonably believed to be in or not opposed to the best interests of the Debtors, and with respect to any criminal action or proceeding, had no reasonable cause to believe the Plan Administrator's conduct was unlawful.

4. **Winding Up Affairs**. On and after the Effective Date, the Plan Administrator may, in the name of the Post-Confirmation Debtor, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Plan Administrator may, without application to or approval of the Bankruptcy Court, pay the charges that he or she incurs after the Effective Date for professional fees and expenses that, but for the occurrence of the Effective Date, would constitute Allowed Fee Claims or Allowed Administrative Claims.

5. **Release of Liens**. Except as otherwise expressly provided in the Plan or in any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests against the Property of a Debtor's Estate shall be released, and all the right, title, and interest of any Holder of such mortgages, deeds of trust, liens, or other security interests shall revert to the Post-Confirmation Debtor and its successors and assigns.

6. **Formation and Powers of the Oversight Committee**.

(a) The Committee shall select three (3) members of the Oversight Committee and file a notice of such selection with the Bankruptcy Court. As of the Effective Date, the Oversight Committee shall be have be deemed formed. In the event of the resignation or inability to perform for any reason of any member of the Oversight Committee after the Effective Date, the remaining members of the Oversight Committee shall have the right to designate a successor. If an Oversight Committee member assigns its Claim or releases the Debtors from payment of the balance of its Claim, such act shall constitute a resignation from the Oversight Committee. Until a vacancy on the Oversight Committee is filled, the Oversight Committee shall function in its reduced number.

(b) The individual members of the Oversight Committee shall serve without compensation, except that they shall be entitled to reimbursement of reasonable, actual and necessary out-of-pocket expenses (which shall not include any professional fees and expenses for attorneys or other professionals retained by an individual committee member) from the Plan Administrator.

(c)     Following the Effective Date, the powers and duties of the Oversight Committee shall include (i) approving any release or indemnity in favor of any third party granted or agreed to by the Plan Administrator; (ii) approving the allowance of any Disputed Claim in excess of $500,000; (iii) approving the sale of any assets by the Plan Administrator in excess of $250,000; (iv) reviewing financial information relating to the Post-Confirmation Debtor, which shall be promptly provided by the Plan Administrator upon request by the Oversight Committee; (v)  monitoring distributions to Creditors; (vi) taking such other actions as it deems necessary and appropriate with respect to the implementation of the Plan; (vii) prior to the payment of each invoice for services rendered by the Plan Administrator in his, her, or its capacity as Plan Administrator, reviewing and approving each such invoice, which invoice shall be deemed approved if not objected to by the Oversight Committee within 10 days of receipt; (viii) removing and replacing the Plan Administrator in accordance with Section 7.3 of the Plan; and (ix) performing such additional functions as may be provided for by further order of the Bankruptcy Court entered after the Effective Date.

(d)     Following all payments being made to the holders of Allowed Claims under the Plan and the closing of the Chapter 11 Cases, the Oversight Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations to and arising from their service as Oversight Committee members.

7.     **Dissolution**.  As soon as practicable after the Effective Date and consistent with the orderly sale and liquidation of the Assets, the Debtors shall be dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of a Debtor or payments to be made in connection therewith, provided, however, that the Plan Administrator shall be authorized (a) to continue such operations as may be necessary to effect the orderly sale and liquidation of the Assets, (b) to file a Debtor's final tax returns, (c) to file and shall file with the official public office for keeping corporate records in the Debtor's state of incorporation and/or country of incorporation, a certificate of dissolution or equivalent document, and (d) to perform such other and further activities consistent with the Plan. Except to the extent that operations continue consistent with the Plan, from and after the Effective Date, the Debtors (i) for all purposes shall be deemed to have withdrawn its business operations from any state or country in which it was previously conducting or is registered or licensed to conduct its business operations, and the Debtors shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, (ii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

8.     **Insurance**.  On or as soon as practicable after the Effective Date, the Post-Confirmation Debtor and the Plan Administrator may obtain a fidelity bond or similar insurance in the estimated amount of the Assets on the Effective Date. In addition, the Plan Administrator may obtain (if available) directors' and officers' liability insurance or errors and omission insurance (or equivalent insurance).

I.     **Distributions**

1. **Disbursing Agent**. All distributions under the Plan shall be made by either the Litigation Trustee or the Plan Administrator, as applicable, as Disbursing Agent, or such other entity designated by the Litigation Trustee or Plan Administrator as Disbursing Agent.

2. **Expenses of the Disbursing Agent.** Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Litigation Trustee or Plan Administrator, as applicable, in the ordinary course of business.

3. **Rights and Powers of Disbursing Agent.** The Disbursing Agent shall be empowered to (a) effect all actions necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. In furtherance of the rights and powers of the Disbursing Agent, the Disbursing Agent shall have no duty or obligation to make distributions to any Holder of an Allowed Claim unless and until such Holder executes and delivers, in a form acceptable to the Disbursing Agent, any documents applicable to such distributions.

4. **Delivery of Distributions.** Subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such Holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of a Debtor or its agent, as applicable, unless a Debtor or Post-Confirmation Debtor has been notified in writing of a change of address by the filing of a proof of Claim by such Holder that contains an address for such Holder different than the address of such Holder as set forth on the Schedules.

5. **Record Date for Distributions.** As of the close of business on the Effective Date, the registers for Claims and Interests shall be closed, and there shall be no further changes in the Holder of record of any Claim. The Post-Confirmation Debtor, the Disbursing Agent, and the Litigation Trustee or Plan Administrator, as applicable, shall have no obligation to recognize any transfer of Claim or Interest occurring after the Effective Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan only those Holders of record on the registers of Claims and/or Interests, as of the close of business on the Effective Date for distributions under the Plan.

6. **Reserve for Plan Expenses.** Prior to making any distributions, the Litigation Trustee or Plan Administrator, as applicable, shall set aside, deduct, and reserve an amount of Cash equal to the estimated amount of Plan Expenses in the Plan Expense Reserve Fund. Any Cash in such Plan Expense Reserve Fund that the Litigation Trustee or Plan Administrator, as applicable, deems to be excess prior to the closing of the Chapter 11 Cases shall be distributed to Holders of Allowed Claims and Interests pursuant to Article VIII of the Plan.

7. **Objections to Claims.** Subject to the express provisions of the Plan, the Litigation Trustee shall have the exclusive authority to file, settle, compromise, withdraw or litigate any objections to Claims. Objections to Claims shall be filed with the Bankruptcy Court and served upon affected Creditors no later than one hundred eighty (180) days after the Effective Date, provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the Litigation Trustee. Notwithstanding the foregoing, in the event that a party filing any Claim after the applicable Bar Date shall obtain the written consent of the Litigation Trustee to file such Claim late or obtains an order of the Bankruptcy Court upon notice to the Litigation Trustee that permits the late filing of the Claim, then the Litigation Trustee shall have one hundred eighty (180) days from the date of such written consent or order to object to such Claim, which deadline may be extended by the Bankruptcy Court upon motion of the Litigation Trustee. Subject to Bankruptcy Court approval, objections to Claims may be litigated to judgment, settled, or withdrawn by the Litigation Trustee.

8. **Distributions on Disputed Claims.** Distributions with respect to and on account of Disputed Claims will be made as soon as practicable after an order, judgment, decree or settlement agreement with respect to such Claim becomes a Final Order rendering such Claim an Allowed Claim, provided that (a) the applicable Creditor shall not receive interest on its Allowed Claim, despite anything contained herein to the contrary, from the date the objection is filed and served to the date of allowance of such Claim, and (b) nothing shall require the Disbursing Agent to make a distribution other than in accordance with Section 8.1 of the Plan.

9. **Disputed Claim Reserves.** On and after the Effective Date, the Litigation Trustee or Plan Administrator, as applicable, shall establish and maintain reserves for all Disputed Claims. For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the Holders of Disputed Claims in such Class had their Disputed Claims been deemed Allowed Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Litigation Trustee or Plan Administrator, as applicable. If, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order or by settlement by the Litigation Trustee or Plan Administrator, as applicable, the relevant portion of the Cash held in reserve therefor shall be distributed by the Disbursing Agent to the Creditor. The balance of such Cash, if any, remaining after all Disputed Claims have been resolved, shall be distributed Pro Rata to all Holders of Allowed Claims in accordance with Article VIII of the Plan. No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by settlement or Final Order.

10. **Unclaimed Property.** Within forty-five (45) days after any distribution, the Disbursing Agent shall file with the Bankruptcy Court and serve upon all parties requesting notice a report of undeliverable distributions. If any distribution remains unclaimed for a period of sixty (60) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto, or if such distribution is returned to the Disbursing Agent by the United States Postal Service marked as undeliverable, such unclaimed property shall be forfeited by such Holder absent further order of the Bankruptcy Court. Furthermore, all right, title and interest in and to the unclaimed property shall be held in reserve by the Post-Confirmation Debtor to be distributed to other Creditors in accordance with the Plan. Any distribution that remains unclaimed for a period of sixty (60) days after the Disbursing Agent making the final

distribution under the Plan shall, after satisfaction of any accrued but unpaid Plan Expenses, be donated to the American Bankruptcy Institute Endowment Fund, a not-for-profit, non-religious organization dedicated to, among other things, promoting research and scholarship in the area of insolvency.

11. **Withholding Taxes.** Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes. Allowed Claims of Holders otherwise entitled to receive a distribution under the Plan but who fail to provide a complete Internal Revenue Service W-9 form within thirty (30) days after request is made by the Disbursing Agent shall be entitled to no distribution without further order of the Bankruptcy Court; provided, however, that where any such Holder would be entitled to receive a distribution of $10,000 or more, the Disbursing Agent, Litigation Trustee or Plan Administrator, as applicable, shall seek an order of the Bankruptcy Court expunging the Claim.

12. **Fractional Cents.** Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

13. **Payments of Less than Twenty-Five Dollars.** If a Cash payment otherwise provided for by the Plan with respect to an Allowed Claim or Interest would be less than twenty-five ($25.00) dollars (whether in the aggregate or on any payment date provided in the Plan), notwithstanding any contrary provision of the Plan, the Disbursing Agent shall not be required to make such payment and such funds shall be otherwise distributed to Holders of Allowed Claims in accordance with Article VIII of the Plan. The Disbursing Agent, Litigation Trustee or Plan Administrator, as applicable, may decide to contribute undistributed funds to the American Bankruptcy Institute Endowment Fund, in accordance with Section 8.10 of the Plan if in the reasonable judgment of the Disbursing Agent, Litigation Trustee or Plan Administrator, as applicable, the cost of calculating and making the final distribution of the remaining distributable funds is excessive in relation to the benefits to Creditors who would otherwise be entitled to such funds, and the Claims of any such Holders shall be entitled to no further distribution without further order of the Bankruptcy Court.

14. **Means of Cash Payment.** Cash payments made pursuant to the Plan shall be by check, wire or ACH transfer in U.S. funds or by other means agreed to by the payor and payee or, absent agreement, such commercially reasonable manner as the payor determines in its sole discretion.

15. **Setoffs.** Except as otherwise provided for herein, the Litigation Trustee or Plan Administrator, as applicable, may, but shall not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that a Debtor or its Estate may have against the Creditor, but neither the failure to do so nor the allowance of a Claim hereunder shall constitute a waiver or release by a Debtor or its Estate of any claim it may have against the Creditor.

### J. Unexpired Leases and Executory Contracts

1. **General Treatment of Executory Contracts and Unexpired Leases**. Pursuant to Section 9.1 of the Plan, any and all pre-petition leases or executory contracts not previously rejected by a Debtor, unless (i) specifically assumed pursuant to order(s) of the Bankruptcy Court prior to the Confirmation Date; or (ii) is the subject of a motion to assume or assume and assign pending on the Confirmation Date; or (iii) is expressly identified on the Assumption Schedule, shall be deemed rejected by such Debtor on the Confirmation Date; provided, however, that nothing in Article IX of the Plan shall cause the rejection, breach, or termination of any contract of insurance benefiting a Debtor or its Estate.

2. **Rejection Damages Claims**. Pursuant to Section 9.2 of the Plan, all proofs of claim with respect to claims arising from the rejection of executory contracts or leases shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of entry of the Confirmation Order.

### K. Conditions Precedent to the Effectiveness of the Plan.

1. **Financing Condition**. Depending on whether the Financing Condition is satisfied, the Plan will be consummated as either a Liquidation or a Restructuring. If the Financing Condition is satisfied or waived, the Plan will be consummated as a Restructuring. If the Financing Condition is not timely satisfied or waived, the Plan will be consummated as a Liquidation.

2. **Conditions to Consummating a Liquidation**. The Plan will be a plan of liquidation, and the Debtors will consummate the Liquidation in accordance with Article VII and the other applicable provisions of the Plan, upon the satisfaction (or waiver, as set forth below) of each of the following conditions has been satisfied any one or more of which conditions may occur contemporaneously with the occurrence of the Effective Date:

(a)     the Bankruptcy Court shall have entered the Confirmation Order;

(b)     the Confirmation Order shall have become a Final Order; and

(c)     each of the Plan Supplement documents shall have been executed in accordance with its terms.

3. **Additional Condition to Consummating a Restructuring**. The Plan will be a plan of reorganization, and the Debtors will consummate the Restructuring in accordance with Article VI and the other applicable provisions of the Plan, upon the satisfaction (or waiver, as set forth below) of each of the conditions precedent enumerated in Section 10.2 of the Plan *plus* the following condition (the "***Financing Condition***"), which may occur contemporaneously with the occurrence of the Effective Date:

(a)     New Secured Financing, if needed, shall have been fully consummated and funded before the expiration of forty-five (45) days after the Confirmation Date.

The Committee may waive the Financing Condition upon a determination that New Secured Financing is not necessary to either to consummate the Restructuring or otherwise ensure the feasibility of the Plan. If the Financing Condition is not satisfied or waived on or prior to the expiration of forty-five (45) days after the Confirmation Date, then the Debtors shall consummate the Liquidation if all other conditions enumerated in Section 10.2 of the Plan are timely satisfied or waived.

4.  **Waiver of Conditions**. The Committee, in its sole discretion, may at any time, without notice or authorization of the Bankruptcy Court, waive the condition set forth in Sections 10.2(b) of the Plan. The failure of the Committee to satisfy or waive such condition may be asserted by the Committee regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Committee). The Committee reserves the right to assert that any appeal from the Confirmation Order shall be moot after consummation of the Plan.

5.  **Effect of Failure of Condition**. In the event that the condition specified in Section 10.2(b) of the Plan has not occurred or been waived on or before forty-five (45) days after the Confirmation Date, the Confirmation Order may be vacated upon order of the Bankruptcy Court after motion made the Committee or any party in interest.

L.  **Cramdown**. To the extent any Impaired Class of Claims or Interest Holders entitled to vote on the Plan votes to reject the Plan, the Committee and Trustee reserve the right to request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to such Class.

M.  **Effect of Confirmation**

1.  *Exculpation*. *Except as otherwise expressly provided by the Plan or the Confirmation Order or other Final Order of the Bankruptcy Court, on the Effective Date, the Exculpated Parties and each of their respective agents, representatives, successors and assigns, shall be deemed released is released and exculpated from any claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Cases, including, without limiting the generality of the foregoing, all sales of assets, the Disclosure Statement, the formulation, dissemination and pursuit of approval of the Disclosure Statement, the formulation, dissemination and pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that constitute willful misconduct, gross negligence or fraud, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.*

2.  *Voluntary Releases by the Releasing Parties*. *Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors, the implementation of the restructuring contemplated by the Plan, and the compromises contained herein, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) will be deemed to conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, and discharge the Released*

*Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the business of the Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or, in each case, related agreements, instruments, or other documents, any action or omission as an officer, member, agent, representative, fiduciary, controlling person, affiliate, or responsible party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, or a criminal act. Nothing in this provision shall be construed or otherwise operate to release any claim or Cause of Action that may be held by the Debtors, the Bankruptcy Estates, or the Reorganized Debtor.*

*Each of the Releasing Parties will be deemed to have granted the releases set forth in this section notwithstanding that such Releasing Party may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Releasing Party expressly waives any and all rights that they may have under any statute or common law principle that would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.*

3. ***Injunction****. Except as otherwise expressly provided in the Plan, on and after the Confirmation Date, all Entities who have held, hold or may hold Claims against a Debtor or Interests in a Debtor are permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting a Debtor's Estate, the Post-Confirmation Debtor, or any of the Released Parties, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, including without limitation the Litigation Trustee and Plan Administrator, or any property of any such transferee or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree or order against a Debtor's Estate, the Post-Confirmation Debtor, or any of the Released Parties, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities, including without limitation the Litigation Trustee and Plan Administrator; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor's Estate, the Post-Confirmation Debtor, or any of the Released Parties, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities, including without limitation the Litigation and Plan Administrator; (d) asserting any right of*

*setoff, of any kind, directly or indirectly, against any obligation due to a Debtor's Estate, the Post-Confirmation Debtor, or any of the Released Parties, any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Entities, including without limitation the Litigation Trustee and Plan Administrator; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan. Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date; provided, however, that no such injunction or stay shall preclude enforcement of any interested party's rights under the Plan and the related documents.*

N.     **Retention of Jurisdiction**.  Pursuant to Article XI of the Plan, following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Post-Confirmation Debtor, Litigation Trustee or Plan Administrator, as applicable, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

1.     **Claims**.  To determine the allowability, classification, or priority of Claims against a Debtor upon objection by the Litigation Trustee.

2.     **Injunctions**.  To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Entity.

3.     **Fee Claims**.  To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before or after the Effective Date, as provided for in the Plan.

4.     **Dispute Resolution**.  To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and the making of distributions thereunder.

5.     **Leases and Executory Contracts**.  To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, and to determine the allowance of any Claims resulting from the rejection of executory contracts and unexpired leases.

6.     **Actions**.  To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted prior to the closing of the Chapter 11 Cases, including any remands.

7. **Causes of Action**. To determine any and all "Causes of Action" as defined under Section 1.14 of the Plan.

8. **Taxes**. To hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code §§ 346, 505, and 1146.

9. **General Matters**. To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code, including but not limited to in connection with the sale or liquidation of Assets by the Post-Confirmation Debtor.

10. **Plan Modification**. To modify the Plan under Section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes.

11. **Aid Consummation**. To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code.

12. **Implementation of Confirmation Order**. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated.

13. **Final Decree**. To enter a Final Decree closing the Chapter 11 Cases.

## VII. LIQUIDATION AS AN ALTERNATIVE TO THE PLAN

Under the Bankruptcy Code, the Plan may not be confirmed by the Bankruptcy Court unless (a) all creditors in an impaired class of Claims have accepted the Plan, or (b) the Plan is in the "best interests" of Creditors. The Plan will be found to be in the "best interests" of Creditors if Creditors will receive a distribution under the Plan as of the Effective Date which is not less than the distribution a Creditor would receive if the Debtors are liquidated in a Chapter 7 case under the Bankruptcy Code.

The Plan provides that Class 2 and Class 3 are impaired and entitled to vote to either accept or reject the Plan.

The starting point in determining whether the Plan would meet the "best interests" test is a determination of the amount of proceeds that would be generated from a liquidation of the Debtors' Assets in a Chapter 7 liquidation. It is assumed that in a Chapter 7 liquidation of the Debtors, the Debtors' Assets would be sold in a distressed sale. Further, it is assumed that under Chapter 7 no further effort would be expended by the Chapter 7 trustee to improve the quality and marketability of the Debtors' Assets. As a result of these factors, the amount of proceeds that would be realized by a Chapter 7 trustee from the Debtors' Assets would likely be less in Chapter 7 than would be the case if the Post-Confirmation Debtor, Litigation Trustee or Plan Administrator, as applicable, implemented the provisions of the Plan through a Restructuring or a going concern Liquidation of the Debtors' Assets.

In addition, distributions in Chapter 7 cases will be further reduced by the administrative costs of a Chapter 7 case including the Chapter 7 trustee's compensation and the fees and expenses of professionals retained by a Chapter 7 trustee. Moreover, the potential Chapter 7 liquidation distribution in respect of each class would be reduced by costs imposed by the delay caused by conversion of the Chapter 11 cases to Chapter 7 cases.

A Liquidation Analysis incorporating the assumptions discussed above is attached hereto as **Exhibit "B"**.

Based on the assumptions discussed above and the attached Liquidation Analysis, the Committee and Trustee believe that Creditors will receive a recovery under the Plan which is at least equal in value to the recovery Creditors would receive in a liquidation of the Debtors in a Chapter 7 case and, therefore, the Plan satisfies the "best interests" test under the Bankruptcy Code.

## VIII.  PERFORMANCE OF THE PLAN AND RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, Holders of Claims that are entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**A.**      **The Committee and Trustee May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan.**  If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Committee and Trustee may seek, as promptly as practicable thereafter, Confirmation. If the Plan does not receive the required support from at least one impaired Class, the Committee and Trustee may not be able to confirm the Plan.

**B.**      **The Committee and Trustee May Not Be Able to Secure Confirmation of the Plan.**  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) such plan is feasible; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to any non-accepting Classes (if any). If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Committee and Trustee, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class (if any), as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

**C.** **Risk of Non-Occurrence of Effective Date.** Although the Committee and Trustee believe that the Effective Date would occur shortly after the Confirmation Date, there can be no assurance as to such timing.

**D.** **Approval of the Plan By the Singapore Court May Be Required.** The Committee and Trustee believe there is a potential conflict between the United States and Singapore on which jurisdiction is the main proceeding, and a Plan confirmed by the Bankruptcy Court may not be enforceable in Singapore absent Singapore Court approval. Pursuant to Singapore insolvency and restructuring law, the Singapore Court may require separate meetings of shareholders and creditors and for which there are different required thresholds for approval in both numbers and amounts of claims than those required thresholds provided for in Section 1126(c) of the Bankruptcy Code. There can be no assurance that Singapore Court approval of the Plan will be obtained, if such approval is sought and/or required.

**E.** **Post-Effective Date Risks.** Following the Effective Date, the risk factors bearing on the success or failure of the Plan, include, but are not limited to: (1) under a Restructuring, there can be no assurance that the Restructuring Transactions will be successfully implemented or of the Litigation Trustee's ability to successfully perform his or her duties in accordance with the Plan and the Litigation Trust Agreement; (2) under a Liquidation, there can be no assurance of the Litigation Trustee's and Plan Administrator's ability, as applicable, to maximize the value of the Assets and locate purchasers for the Assets who are ready, willing, and able to pay reasonable value in exchange for the Assets; and (3) there can be no assurance that there will be sufficient Net Proceeds of the Causes of Actions generated to provide a recovery to Creditors. Notwithstanding these risk factors, the strategy proposed in the Plan is likely to yield greater value for Creditors than would an immediate liquidation in a Chapter 7 case.

IX.     TAX CONSEQUENCES OF PLAN

A.      **Introduction**.  The following discussion summarizes certain of the important federal income tax consequences of the transaction described herein and in the Plan. This discussion is for informational purposes only and does not constitute tax advice. This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, judicial authority and current administrative rulings and practice. Neither the impact on foreign holders of claims nor the tax consequences of any transaction under state or local law is discussed. Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, life insurance companies and tax-exempt organizations. Furthermore, due to the complexity of the transactions contemplated in the Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties. No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service on these or any other tax issues. There can be no assurance that the Internal Revenue Service will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. **HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

B.      **Tax Consequences to the Debtors**.  If a Restructuring is consummated and the Plan constituting a Plan of Reorganization become effective, the Debtors will receive a discharge of their debts under 11 U.S.C. § 1141(d)(3), and, as a result, will be deemed to have received a discharge for tax purposes.  If a Restructuring is not consummated and the Plan constituting a Plan of Liquidation becomes effective, the Debtors will not receive a discharge of their debts under 11 U.S.C. § 1141(d)(3), and, will not be deemed to have received a discharge for tax purposes. Under either scenario, if an Allowed Claim is not paid in full, there may be cancellation of indebtedness income to the Debtors at such time.

C.      **Tax Consequences to Creditors.**

1.      **In General**.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes; (b) whether the Claimant receives consideration in more than one tax year; (c) whether the Claimant is a resident of the United States; (d) whether all the consideration by the Claimant is deemed to be received by that Claimant as part of an integrated transaction; (e) whether the Claimant reports income using the accrual or cash method of accounting; and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.  The U.S. federal income tax consequences for non-U.S. holders of a Claim may be different than those for U.S. holders of a Claim.

2.      **Gain or Loss on Exchange**.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the

holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain if the Claim was a capital asset in the hands of an exchanging Claim holder, and such gain would be a long-term capital gain if the holder's holding period for the debt or security surrendered exceeded one (1) year at the time of the exchange. Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### D.     Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## X.     CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all impaired classes of Claims entitled to vote or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, and as to the impaired Classes of Claims that are deemed to reject the Plan, (ii) is feasible, and (iii) is in the "best interests" of the holders of Claims impaired under the Plan.

### A.     No Unfair Discrimination/Fair and Equitable Test

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the Committee's and Trustee's request if, as to each impaired Class of Claims which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable".

A Chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests.

Under the Bankruptcy Code, "fair and equitable" has different meanings for secured and unsecured claims. With respect to a secured claim, "fair and equitable" means (i) the

impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal in value to the allowed amount of its claim with a present value as of the effective date of the plan at least equal in value to such creditor's interest in a Debtor's interest in the property securing its claim, (ii) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, the lien attaches to the proceeds of the sale, and such lien proceeds are treated in accordance with clause (i) or (ii) of this paragraph, or (iii) if the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan. With respect to an unsecured claim, "fair and equitable" means either (i) each impaired unsecured creditor receives or retains property of a value, as of the effective date of the Plan, equal to the amount of its allowed claim, or (ii) the holders of claims or interests that are junior to the claims or interests of the dissenting class will not receive or retain any property under the Plan.

Under the Plan, no Holder in a Class of Claims is to receive cash or other property in excess of the full amount of its Allowed Claim. Holders of Interests will receive no payment under the Plan, and their interests are to be cancelled. Accordingly, the Committee and Trustee believe that the Plan does not discriminate unfairly as to any impaired Class of Claims and is fair and equitable with respect to each such Class.

### B.     "Best Interests" Test

As discussed in Section VII above, the Bankruptcy Code provides that unless all holders of impaired Claims have accepted the Plan, the Plan will not be confirmed, regardless of whether or not anyone objects to Confirmation, unless the Bankruptcy Court finds that the Plan is in the "best interests" of all Classes of Claims which are impaired. The "best interests" test will be satisfied by a finding of the Bankruptcy Court that the Plan will provide such a holder that has not accepted the Plan with a recovery at least equal in value to the recovery such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

For the reasons set forth in Section VII above, and as shown in **Exhibit "B"**, it is believed that each impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

### C.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a Chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the Debtors. The Bankruptcy Court will find the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-confirmation obligations to pay for the costs of administering and fully consummating the Plan. Subject to the Risk Factors set forth in Section VIII of this Disclosure Statement, the Committee and Trustee believe that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

## XI. MISCELLANEOUS PROVISIONS

**A. Modification.** The Plan may be altered, amended or modified by the Committee and Trustee before the Confirmation Date as provided in Section 1127 of the Bankruptcy Code. The Post-Confirmation Debtor may, with the approval of the Bankruptcy Court and without notice to all Holders of Claims and Interests, insofar as it does not materially and adversely affect the interest of Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan. The Plan may be altered or amended after the Confirmation Date by the Post-Confirmation Debtor in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, provided that such alteration or modification is made after a hearing as provided in Section 1127 of the Bankruptcy Code.

**B. Withdrawal.** The Committee and Trustee reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Committee and Trustee revoke or withdraw the Plan, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred.

**C. Binding Effect.** Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, a Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not such Holder is entitled to a distribution under the Plan.

**D. Successors and Assigns.** The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Entities.

**E. Governing Law.** Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

**F. United States Trustee Fees.** All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date. Thereafter, the Litigation Trustee or Plan Administrator, as applicable, shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a final decree or an order converting or dismissing the Chapter 11 Cases.

**G. Non-Voting Equity Securities.** To the extent applicable, the Debtors shall comply with the provisions of Section 1123(a)(6) of the Bankruptcy Code.

**H. Retiree Benefits.** From and after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, the Post-Confirmation Debtor shall continue to pay all retiree benefits (as defined in Section 1114 of the Bankruptcy Code), if any, established or maintained by a Debtor prior to the Effective Date. The Committee and Trustee believe that there are no such benefits.

**I.** **Section 1146 Exemption**. Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by, the Plan or the revesting, transfer or sale of any real or personal property of a Debtor pursuant to, in implementation of, or as contemplated by, the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Without limiting the foregoing, pursuant to Section 1146(a) of the Bankruptcy Code, the sale by the Post-Confirmation Debtor, Litigation Trustee or Plan Administrator, as applicable, of any real property, or recordation by the Post-Confirmation Debtor, Litigation Trustee or Plan Administrator, as applicable, of any deed of trust or mortgage (including any amendment to any deed of trust or mortgage), from and after the Effective Date of the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.

**J.** **Severability.** If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the option of the Committee and Trustee remain in full force and effect and not be deemed affected. However, the Committee and Trustee reserve the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.** **Waiver of Stay**. The Committee and Trustee will request as part of the Confirmation Order a waiver from the Bankruptcy Court of the fourteen day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the fourteen day stay of Bankruptcy Rule 6004(h).

**L.** **No Release by United States Government, Agencies, State or Local Authorities.** Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

## XII.   CONCLUSION AND RECOMMENDATION

THE COMMITTEE AND TRUSTEE SUBMIT THAT THE PLAN COMPLIES IN ALL RESPECTS WITH CHAPTER 11 OF THE BANKRUPTCY CODE AND THE COMMITTEE AND TRUSTEE RECOMMEND TO HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN THAT THEY VOTE TO ACCEPT THE PLAN.


Dated:  June 3, 2020

Official Committee of Unsecured Creditors of Rooftop Group International Pte. Ltd.


By:  _/s/ Sian Mimmo_____

Name: Sian Mimmo
Title:   Chair
Official Committee of Unsecured Creditors of Rooftop Group International Pte. Ltd.

Chapter 11 Trustee, Rooftop Group USA, Inc., and Rooftop Group Services (US) Inc.


By:   _/s/ Daniel J. Sherman_____

Name: Daniel J. Sherman


Submitted by:

Judith W. Ross
State Bar No. 21010670
Rachael L. Smiley
State Bar No. 24066158
ROSS & SMITH, PC
700 North Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email:   judith.ross@judithwross.com
             rachael.smiley@judithwross.com

James E. Van Horn
(admitted *pro hac vice*)
BARNES & THORNBURG LLP
1717 Pennsylvania Avenue NW, Suite 500
Washington, D.C.  20006-4623
Telephone: 202-371-6351
Facsimile: 202-289-1330
Email:    jvanhorn@btlaw.com

**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ROOFTOP GROUP INTERNATIONAL PTE. LTD., Case No. 19-43402-mxm11**

Daniel J. Sherman
State Bar No. 18241000
SHERMAN & YAQUINTO, L.L.P.
509 N. Montclair Avenue
Dallas, TX 75208-5498
Telephone: 214-942-5502
Facsimile: 214-946-7601
Email: Corky@syllp.com

**CHAPTER 11 TRUSTEE, ROOFTOP GROUP USA, INC., Case No. 19-44234-mxm11, and ROOFTOP GROUP SERVICES (US) INC., Case No. 19-44235-mxm11**

Document comparison by Workshare Compare on Monday, June 22, 2020
10:47:57 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\jvanhorn\Desktop\6.3 Rooftop filing\Disclosure Statement.docx |
| Description | Disclosure Statement |
| Document 2 ID | file://C:\Users\jvanhorn\Desktop\Rooftop solicitiation\Disclosure Statement_6.22.docx |
| Description | Disclosure Statement_6.22 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 93 |
| Deletions | 85 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 178 |